429 A.2d 631

**In re Joseph SCHMIDT, Respondent.**

**Appeal of COUNTY OF ALLEGHENY.**

Supreme Court of Pennsylvania.

Argued Sept. 24, 1979.

Reargued Sept. 30, 1980.

Decided Feb. 4, 1981.

Reargument Denied May 28, 1981.

James H. McLean, County Sol., James A. Esler and Dennis Biondo, Asst. County Sols., Pittsburgh, for appellant.

Marlene W. Jackson, Asst. Atty. Gen., for Dept. of Public Welfare.

Thomas E. Coval, Willow Grove, Timothy E. Finnerty, Pittsburgh, for Joseph Schmidt.

Before O'BRIEN, C. J., ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

NIX, Justice.

Appellant, County of Allegheny, petitioned the Court of Common Pleas for the involuntary commitment of respondent, Joseph Schmidt, to an appropriate facility. Appellee, Commonwealth of Pennsylvania, intervened as a party-respondent and presented testimony to establish that the state-operated facility known as Western Center would not be an appropriate facility as required by the Mental Health and Mental Retardation Act of 1966 (hereinafter referred to as the Act). Act of October 20, 1966, Special Sess. No. 3, P.L. 96, § 406, 50 P.S. § 4406. The trial court concluded that respondent was a mentally retarded individual requiring a closely supervised structured residential program.

The county was ordered to "develop a practical life management plan" setting forth "in detail the type of residential placement appropriate for [respondent] with a placement appropriate for his needs." The county was given a six-month period in which to complete the placement of respondent in an appropriate facility meeting his needs. The trial court further ordered that during the six-month period, but no longer, respondent was to be temporarily committed to the state-operated institution known as Western Center, even though that institution was not an appropriate facility for respondent. The court en banc expressed the hope that, "If Joseph receives an appropriate placement that meets his needs, . . . the time might come when placement at Western Center will in fact be appropriate." This appeal by the county followed.

Respondent is an adult male who at the age of eight was placed by the Court of Common Pleas, upon the petition of respondent's family, in a privately operated residential school for mentally retarded children. Respondent resided and received treatment for the following fourteen years at this school which was under contract with the county to provide such care. He is able to walk, although he frequently moves around on his hands and knees. He can use a scoop dish to feed himself but still requires much assistance. He is unable to discriminate between edible and inedible objects and, although not toilet trained, he is toilet regulated. The school found that as respondent grew into a husky, muscular young man, it was unable to channel his physical energy and curiosity and was unable to provide the constant supervision respondent required. The county attempted unsuccessfully to find other suitable placement for respondent. It was at this point, after fourteen years of assuming the responsibility, that appellant county petitioned for respondent's commitment to an appropriate state facility.

Evidence established that Western Center was not an appropriate facility for respondent since its staff-patient ratio was 1:14. Respondent's previous school found that it could not adequately treat respondent in a 1:7 staff-patient

ratio. Testimony at the hearing established that in order for respondent to receive the training he needs to reduce dependency, respondent must be in a setting with a 1:3 staff-patient ratio. Respondent was, however, temporarily committed to Western Center, since there was no alternative placement available to the trial court.

Neither is there any real dispute between the county and the state that (1) the county does not presently have a program that will meet respondent's needs; and (2) Western Center does not presently have a program to meet respondent's needs. The actual controversy between the county and the state is which of them is legally obligated to assume the responsibility for providing the proper care for respondent. The county argues that the trial court should have placed upon the state the responsibility of providing appropriate care. The state, on the other hand, argues that the trial court's order should be affirmed because it is the county's responsibility to provide the proper care for respondent.

We start the inquiry with the realization that the mentally retarded are in no way responsible for their dependency, and that society's concern for their welfare should not be grudgingly or reluctantly given. We also recognize that this is not a question of which governmental unit will ultimately bear the financial cost of the services required.[1] The basic issue is which governmental unit has the responsibility to assume the initiative in locating and developing the appropriate placement. The court below determined that it was the county's responsibility; for the reasons that follow, we cannot agree.

■ We are not here concerned with the legitimacy of the deprivation of the liberty of an individual that may be occasioned by residential placement. *See, e. g., Haldeman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295 (E.D. Pa.1977); *Goldy v. Beal,* 429 F.Supp. 640 (M.D.Pa.1976); *New York Association for Retarded Children v. Rockefeller,*

1. *See* 50 P.S. §§ 4508, 4509.

357 F.Supp. 752 (E.D.N.Y.1973); *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972). This Commonwealth has committed itself to a rejection of the former view that indiscriminate institutionalization was the panacea for the resolution of the problems presented by citizens who were not self-sufficient because of mental retardation. Act of July 9, 1976, P.L. 817, No. 143, § 102, 50 P.S. § 7102 (Supp. 1980–81).[2] We also embrace the view that a mentally retarded person shall not be determined to require involuntary residential placement unless the degree of retardation shows an inability to provide for the most basic personal needs and provision for such needs is not available and cannot be developed or provided for in the existing home or in the community in which the individual resides.

Our question here is somewhat different. Here there is no question that residential care will be required for the long-term care of Joseph Schmidt, even under the most favorable prognosis. This is not an instance where there is a possibility of a less structured placement than those made available by existing state facilities. To the contrary, the available state facility is inadequately structured for respondent's present needs and the anticipated objective of the court below is to provide him with the skills to cope with life in a setting such as Western Center. The question to be

2. The statement of policy of the Mental Health Procedures Act provides:

It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm where the need is great and its absence could result in serious harm to the mentally ill person or to the others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed. Persons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness: . . .

50 P.S. § 7102 (Supp. 1980–81).

decided here is under existing statutory law which governmental unit, i. e., the state or county, has the responsibility to locate or develop the long-term residential program required by respondent.

The responsibilities and duties of the state are set forth in Art. II of the Act. Specifically, § 201(1) of the Act, 50 P.S. § 4201(1), states that it shall be the duty of the state "to assure within the State the availability and equitable provision of adequate . . . mental retardation services for all persons who need them, . . . ." Subsection (4) further requires the state to "adopt State-wide plans for the operation of all State operated facilities . . . and to assign to each facility or portion thereof, such duties for the care of the mentally disabled, as the secretary shall prescribe." [3] Section 202(b) of the Act, 50 P.S. § 4202(b), authorizes the state through the Department of Public Welfare (department) "to establish, extend, operate and maintain additional facilities and provide . . . mental retardation services therein."

In counter distinction to the obligation and responsibilities of the state the Act describes in Art. III the obligations and responsibilities of the counties. Specifically, § 301(d) of the Act, 50 P.S. § 4301(d), provides that:

. . . it shall be the duty of local authorities in cooperation with the department to insure that the following mental health and mental retardation services are available:

(1) Short term inpatient services other than those provided by the State.

(2) Outpatient services.

(3) Partial hospitalization services.

(4) Emergency services twenty-four hours per day which shall be provided by, or available within at least one of the types of services specified heretofore in this paragraph.

(5) Consultation and education services to professional personnel and community agencies.

---

**3.** The definitional section of the Act includes mental retardation within the term "mental disability." 50 P.S. § 4102.

(6) Aftercare services for persons released from State and County facilities.

(7) Specialized rehabilitative and training services including sheltered workshops.

(8) Interim care of mentally retarded persons who have been removed from their homes and who having been accepted, are awaiting admission to a State operated facility.

(9) Unified procedures for intake for all county services and a central place providing referral services and information.

Paragraph (e) of section 301 of the Act, 50 P.S. § 4301, grants the power to local authorities to establish certain enumerated services and programs beyond those mandated under paragraph (d).

It is evident that the dichotomy sought to be achieved under the Act was intended to separate and yet coordinate state-county responsibilities to insure the availability of adequate mental retardation services for all of the residents of the states in need of such services. The state, through the department, was given the responsibility for the overall supervision and control of the program. Read together, § 201(1), (4) of the Act, 50 P.S. § 4201(1)(4), and 202(b) of the Act, 50 P.S. § 4202(b), impose the duty and grant the authority to ensure adequate services for the mentally retarded. Under § 201(1) of the Act, 50 P.S. § 4201(1), the state has the obligation to provide adequate mental health services and the department is charged with the duty to implement that obligation[4]. The direction in § 201(4) of the Act, 50 P.S. § 4201(4), limited by the clause, "as the secretary shall prescribe" must be read in context

---

4. Section 201(1) of the Act, 50 P.S. § 4201(1) provides:
   The department shall have power, and its duty shall be:

   *   *   *   *   *   *

   (1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them, regardless of religion, race, color, national origin, settlement, residence, or economic or social status.

with the obligations the department is by law required to discharge [5]. The secretary is obligated to prescribe that which is necessary for the implementation of the State's responsibility in this area. The authorization in § 202(b) of the Act, 50 P.S. § 4202(b), provides an additional grant of power which is to be used when required to meet the obligation placed upon the state.[6]

In comparison, the duties assigned to counties are not all encompassing. The counties have been charged under § 301(d) of the Act, 50 P.S. § 4301(d), to provide short term care as well as rehabilitative and supportive services. The county's insistence in this lawsuit upon an interpretation which would limit its function to providing "interim" care for the mentally retarded has justifiably engendered strong disagreement from appellee and the court below. Under the clear language of § 301(d) of the Act, 50 P.S. § 4301(d), there was a greater responsibility reposed in the county than merely providing services to ameliorate the situation until a state placement could be arranged. See § 301(d)(2), (3)(6) and (7) of the Act, 50 P.S. § 4301(d)(2), (3), (6) and (7). We fully agree with the court below that the legislative scheme was designed to require the county to provide those supportive services where they would eliminate the necessity of institutionalization, even where those services would be required on a long term basis.

**5.** Section 201(4) of the Act, 50 P.S. § 4201(4) provides:
The department shall have power, and its duty shall be:
     *     *     *     *     *     *
(4) To adopt State-wide plans for the operation of all State operated facilities under the jurisdiction of the department and to assign to each facility or portion thereof, such duties for the care of the mentally disabled, as the secretary shall prescribe. The assignments herein referred to shall be made with due regard to geographical location and population distribution.

**6.** Section 202(b) of the Act, 50 P.S. § 4202(b) provides:
(b) The department is hereby authorized to establish, extend, operate and maintain additional facilities and provide mental health and mental retardation services therein. The department may also lease or otherwise acquire, through the Department of Property and Supplies, other additional facilities.

■■■ With the acceptance of the principle of "normalization" and the resultant legislation, it is clear that the restrictive view urged by the county as to its obligations in the area is out of step. The concept of normalization envisions that the mentally retarded person and his or her family shall have the right to live a life as close as possible to that which is typical for the general population. Consistent with this concept is the requirement that the least restriction consistent with adequate treatment and required care shall be employed.

The doctrine of least restrictive alternative was first articulated by Chief Judge Bazelon in *Lake v. Cameron*, 364 F.2d 657 (D.C.Cir.1966) and subsequently adopted as a constitutional requirement in a series of commitment and treatment related cases. *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D. Wis.1972) vacated and remanded on other grounds, 94 S.Ct. 713 (1974); *Lynch v. Baxley*, 386 F.2d 378 (M.D.Ala.1974). *Wyatt v. Alderholt*, 503 F.2d 1305 (5th Cir.1974); *Horacek v. Exon*, 357 F.Supp. 71 (D.Neb.1973); *Dixon v. Weinberger*, 405 F.Supp. 974 (D.D.C.1975); *Davis v. Watkins*, 348 F.Supp. 1196 (N.D.Ohio 1974); *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. 1295 (1977).

This approach to the problems related to mental retardation was reflected in the regulations promulgated by the secretary pursuant to § 301 of the Act, 50 P.S. § 4301, on February 10, 1973. Regulations 5200 Appendix IV *County Mental Health and Mental Retardation Program—Service Content of the Program.* The following pertinent excerpts from these regulations are most instructive in the instant inquiry.

The County Program is the means by which minimum services as described in the act shall be readily available to promote the social, personal, physical and economical habilitation or rehabilitation of mentally retarded person with all due respect for the full human, social and legal rights of each person. This means that the health, social, educational, vocational, environmental and legal resources that serve the general population shall be marshalled and

coordinated by the County Program to meet the personal development goals of mentally retarded persons, in accordance with the principle of normalization. . . .

In keeping with this principle of normalization, the County is responsible to utilize county program funds for the mentally retarded to accomplish the following objectives:

\* \* \* \* \* \*

4. shaping and maintaining an environment most productive of basic human personality qualities involving parent-child and sibling relationships, environmental adaptation, self-awareness and learning motivation and ability;

5. specific training and learning situations designed and implemented to develop all potential;

6. community development and restructuring to achieve the maximum normalization for the mentally retarded person wherever he is.

I. *Responsibility for Planning, Direction and Coordinated Delivery of Services—The Base Service Unit* :

The County Administrator shall be responsible to provide for the establishment of an organizational unit consisting of multidisciplinary professional and nonprofessional services for persons who are mentally retarded and in need of service from the County Program. . . . The Base Service Unit shall be responsible to perform the following functions in such a way as to carry out the objectives of the County Program as stated above.

\* \* \* \* \* \*

D. Provide for comprehensive diagnosis and evaluation services to:

\* \* \* \* \* \*

3. Develop a practical life-management plan for the individual and his family and provide the necessary counseling and following-along services; . . . .

■ These regulations make it clear that the legislative grant of power to the counties under § 301(e)(3) of the Act, 50 P.S. § 4301(e)(3), empowering them to establish additional

services and programs "designed to prevent . . . the necessity of admitting or committing the mentally disabled to a facility" was intended to be utilized by the counties to minimize the necessity of institutionalization. It was more than a mere grant of power to be used at the county's option. The power of the department to issue the regulations in question and to require the counties to assume the responsibilities set forth therein was clearly within the purview of section 201 of the Act, 50 P.S. § 4201, which charges the department to create a comprehensive and coordinate program in conjunction with the county governments. Moreover, any question as to the legislative recognition of the concept of normalization and the adoption of the doctrine of least restrictive alternatives in matters relating to the mentally retarded has been removed by the enactment of the Mental Health Procedures Act, Act of 1976, July 9, P.L. 817, No. 143, § 101; 50 P.S. § 7101.

While we agree with the rejection by the court below of the narrow role urged by the county for its participation and obligations in the area of mental retardation, we cannot agree that the county is responsible in this instance for the care of Joseph Schmidt. In this case the need for institutionalization can neither be prevented or minimized. Joseph Schmidt will unquestionably require long term residential placement. There is no less restrictive alternative available for the county to provide. To the contrary, the available state facility is inadequate because it does not provide a sufficiently structured environment for Joseph. The concept of normalization is not a consideration in the placement of Joseph.

It is the state's responsibility to find a placement for Joseph with a staff-patient ratio suitable to his needs. The state will not be allowed to ignore that responsibility and that obligation by stating that an appropriate facility is not immediately available. Section 201(1) of the Act, 50 P.S. § 4201(1), requires the state to provide *adequate* mental retardation services for persons in need of them. Joseph Schmidt has clearly demonstrated his need and the State must respond to it.

Accordingly, the decree of the court below is reversed and the matter is remanded for further proceedings consistent herewith.

LARSEN and FLAHERTY, JJ., filed concurring opinions.

ROBERTS, J., concurred in the result.

LARSEN, J., concurring.

This is solely a matter of statutory construction—is the county or the state responsible, under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4101–4704 (1969), for providing long-term care for mentally retarded and mentally disabled persons who require a closely supervised and structured residential program? I find a construction placing that responsibility on the state eminently more compelling than one placing responsibility on the county.

Article II defines the responsibilities of the state. Section 4201 of Article II provides:

> The department shall have power, and its duty shall be: (1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them. . . .

Section 4201(4) further provides the department has the power and duty:

> To adopt State-wide plans for the operation of all State operated facilities under the jurisdiction of the department and to assign to each facility or portion thereof, such duties for the care of the mentally disabled, as the secretary shall prescribe.

While § 4201(1) and (4) standing alone might not be sufficient to clearly dispel the Commonwealth's notion that the state has only supervisory powers, § 4202 does so in no uncertain terms. Section 4202 provides:

> (a) The department *shall operate all State facilities* and shall assign such functions to each as the secretary shall prescribe. (b) The department is hereby authorized to *establish, extend, operate and maintain additional facilities and provide mental health and mental retardation services therein.* (emphasis added)

Thus, reading §§ 4202 and 4201 together, the state has been given a general grant of authority and the duty to establish and to operate such facilities as are *necessary* to assure the availability and equitable provision of adequate mental health and mental retardation services in this Commonwealth.

Conversely, the counties have been given no corresponding general grant of authority and duty in Article III, which delineates the powers and duties of counties. Section 4301 provides, in relevant part:

(d) . . . it *shall be the duty* of local authorities in cooperation with the department to insure that the following mental health and mental retardation services are available:

(1) *Short term inpatient services* other than those provided by the State.

(2) *Outpatient services.*

(3) *Partial hospitalization services.*

(4) *Emergency services* twenty-four hours per day which shall be provided by, or available within at least one of the types of services specified heretofore in this paragraph.

(5) *Consultation and education services* to professional personnel and community agencies.

(6) *Aftercare services* for persons released from State and County facilities.

(7) *Specialized rehabilitative and training services including sheltered workshops.*

(8) *Interim care of mentally retarded persons who* have been removed from their homes and who having been accepted, *are waiting admission to a State operated facility.*

(9) Unified *procedures for intake* for all county services and a central place providing referral services and information. (emphasis added)

(e) Such local authorities shall also *have the power to establish* the following additional services or programs for the mentally disabled:

(1) Training of personnel.

(2) Research.

(3) Any other service or program *designed to prevent* mental disability or the *necessity of admitting or committing the mentally disabled to a facility.* (emphasis added)

Neither subsection (d) nor (e) generally grants authority to establish the type of long-range care needed for respondent. While subsection (d) does not purport to be exclusive, the whole tenor of that subsection contemplates interim, temporary or periodic mental health and mental retardation services. The nine services specifically enumerated strongly suggest a legislative scheme allocating short-term and periodic care only to the counties. Moreover, § 4301(d)(8) specifies the county shall provide *interim* care for mentally retarded persons who have been removed from their homes and are *awaiting admission to a state operated facility.* Thus, the legislation clearly envisions state operation of permanent care facilities for the mentally retarded.

It is unfortunate that the Act is not more explicit regarding long-term care of those mentally disabled or retarded persons needing continuous supervision. Since it is not, our task is to give the Act its *most reasonable* interpretation to effectuate the legislature's intent. Given the limited grant of authority to the counties to provide services of an interim, temporary or periodic nature, and given the broad grant to the state to provide adequate mental health and mental retardation services for all persons who need them, it seems clear to me that the legislative scheme allocated the responsibility for long-term care of the mentally infirm to the state.

As Joseph Schmidt undoubtedly requires long-term residential placement, the majority's discussion of the "least restrictive alternative" and the "rejection by the court below of the narrow role urged by the county" is unnecessary. I therefore express no opinion on the merits of this discussion.

FLAHERTY, J., concurring.

I join all of the majority opinion except that portion which cites a regulation promulgated by the executive branch of government as evidence of the intent of the legislative branch of government. The flaw in this reasoning is self-evident.