**Terri Lee HALDERMAN et al., Plaintiffs,**

**v.**

**PENNHURST STATE SCHOOL AND HOSPITAL et al., Defendants,**

**United States of America, Plaintiff-Intervenor,**

**Pennsylvania Association For Retarded Citizens et al., Plaintiffs-Intervenors.**

**Civ. A. No. 74–1345.**

United States District Court, E. D. Pennsylvania.

June 11, 1982.

David Ferleger, Philadelphia, Pa., for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for the Com. of Pa.

Thomas Gilhool, Philadelphia, Pa., for Pennsylvania Ass'n for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., for David Ferleger, Esq.

Pamela P. Cohen, Philadelphia, Pa., for Pennhurst Parents Ass'n.

Terissa Chaw, Civil Rights Div., Dept. of Justice, Washington, D. C., R. Stephen Barrett, Asst. County Sol., Norristown, Pa., for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

On March 2, 1981, this Court issued an order which, *inter alia*, provided that the defendants in this action should, on or before June 30, 1982, provide community living arrangements together with all the services required by the retarded person's Individual Habilitation Plan for 100 residents of Pennhurst whose home counties are outside the Southeast Region of Pennsylvania. On March 10, 1981, defendants Department of Public Welfare of the Commonwealth of Pennsylvania and its Secretary, Helen O'Bannon (hereinafter "Commonwealth defendants") filed a motion asking this Court to alter or amend this portion of its March 2 Order. On February 4, 1982, the Commonwealth defendants filed a Supplemental Motion to Amend and/or Alter this Court's Order of March 2, 1981. A hearing was held on April 16 and 19, 1982 in connection with the motion filed on February 4, 1982. For the reasons hereinafter set forth, the Court will deny the motion of the Commonwealth defendants.

The history of this case is well-known to the litigants, but must again be reiterated in order to describe the situation now confronting the Court and the parties to this case.

During 1977, this case, which began in 1974, was tried before the Court, sitting without a jury, over a period of 32 days. At trial, all parties, including the Commonwealth defendants as well as the other defendants, agreed that Pennhurst as an institution was inappropriate and inadequate

for the habilitation of mentally retarded citizens, and that the retarded should be educated, trained, and cared for in community living arrangements. The defendants insisted, however, that they be permitted to accomplish the community placement of Pennhurst residents pursuant to their own schedule. The Court found this "schedule" to be vague and indefinite. On December 23, 1977, this Court issued Findings of Fact and Conclusions of Law (446 F.Supp. 1295) which found that the defendants were violating the constitutional and statutory rights of the members of the plaintiff class by failing to provide them with adequate habilitation in the least restrictive appropriate environment.

On January 6, 1978, this Court held a further hearing for the purpose of determining the relief which should be granted. The parties were asked to attempt to reach an agreement on the appropriate relief. When the parties informed the Court that they could not agree on an order, the Court requested that they submit separate proposed orders. Finally, on March 17, 1978, the Court issued an Order directing the County and Commonwealth defendants to provide suitable community living arrangements and services for the residents of Pennhurst and the other retarded members of the plaintiff class (446 F.Supp. at 1325). This Court further ordered that Individual Habilitation Plans be developed for each member of the plaintiff class, that appropriate community monitoring mechanisms be designed and implemented, that a friend-advocate system be established to represent some class members and to participate in monitoring the provision of community living arrangements and services, and that a Special Master be appointed to monitor the defendants' planning and implementation activities and report to the Court on the defendants' compliance with the Court's Orders.

The Order of March 17, 1978 was appealed to the Third Circuit. During the pendency of the appeal, this Court issued three major Orders in this case. One of these, the Order of June 8, 1979, set forth a specific timetable for the transfer to the community by September 1, 1979 of the approximately 55 school-age residents of Pennhurst. This Order was necessary because only three school-age residents of Pennhurst had been placed in community living arrangements between March 17, 1978, the date of the Court's original injunctive Order, and June 8, 1979. As of April 22, 1982, 14 of the school-age residents covered by the Order of June 8, 1979 still had not been transferred to community living arrangements (Report of the Special Master, April 22, 1982).

On December 13, 1979, the Court of Appeals issued an Order substantially affirming this Court's Order of March 17, 1978, and remanding the matter to this Court for further proceedings. *Halderman v. Pennhurst State School and Hospital*, 3 Cir., 612 F.2d 84. This Court, pursuant to the remand order, established an impartial hearing procedure and appointed a Hearing Master to provide the individual determinations mandated by the Circuit Court for Pennhurst residents being placed into the community, and for other retarded members of the class being recommended for admission to State facilities for the mentally retarded.

The United States Supreme Court granted *certiorari* in this case on June 10, 1980, and on June 30, 1980 entered a limited stay order which, in effect, allowed only "voluntary" transfers of Pennhurst residents to the community pending final disposition of the matter. On July 14, 1980, this Court ordered the Hearing Master to hold a hearing for each Pennhurst resident for whom a community living arrangement had been prepared, for the purpose of determining whether the proposed transfer from Pennhurst to the community was "voluntary." On December 1, 1980, the Supreme Court declined to disturb this Court's interpretation and application of its stay order.

On April 20, 1981, the United States Supreme Court reversed the Third Circuit's determination that the Bill of Rights for the Handicapped contained in the Developmentally Disabled Assistance and Bill of

Rights Act, 42 U.S.C. § 6010, created in favor of the mentally retarded a substantive right to appropriate habilitation and treatment in the least restrictive environment. The Supreme Court remanded this case to the Third Circuit for consideration of the federal Constitutional and statutory issues as well as the state law questions raised by this Court in its Memorandum of December 23, 1977. 451 U.S. 1, 29–31, 101 S.Ct. 1531, 1546–47, 67 L.Ed.2d 694.

On February 26, 1982, the Third Circuit, pursuant to the Supreme Court's remand, issued its second *en banc* decision in this case. The Third Circuit again affirmed, holding that Pennsylvania's Mental Health/Mental Retardation Act of 1966, 50 Pa.Stat.Ann. §§ 4101–4704 (Purdon 1969), granted Pennsylvania's retarded citizens the right to adequate habilitation in the least restrictive environment. Although the Commonwealth defendants are once again petitioning for certiorari to the Supreme Court, there is no stay of this Court's Orders mandating the community placement of those Pennhurst residents whose individual habilitation plans require community living arrangements in order to provide for their adequate habilitation. (Orders of March 17, 1978; June 8, 1979; April 24, 1980; March 2, 1981).

The transfer of retarded citizens from confinement at Pennhurst to habilitation in the community proceeded at snail's pace from 1978 through 1980. For that reason, this Court, on May 27, 1980, held a hearing on a Rule to Show Cause and after that hearing determined, among other things, that the Commonwealth defendants, based on the evidence presented at the hearing and upon their own representation, were capable of placing 100 Pennhurst residents from counties outside the Southeast Region of Pennsylvania in community arrangement during the fiscal year commencing July 1, 1981 and ending June 30, 1982. In its Order of March 2, 1981, the Court ordered the Commonwealth defendants to effectuate 100 such transfers on or before June 30, 1982.

In early 1978, when this Court entered the injunctive order designed to provide to the retarded residents of Pennhurst their state statutory, federal statutory, and federal constitutional rights, the Court hoped and expected that the defendants would provide these rights to the retarded with a minimum of supervision and an absence of coercion. However, the intervening years have shown that the defendants have failed to act diligently and with steadfast purpose to comply with the Court's Orders in this case. In fact the defendants have acted as though this Court never entered its decision but merely approved the defendants' trial position of community placement according to the defendants' own vague and uncertain schedule. Faced with this apparent disregard for the Court's Orders and the rights of the retarded, the Court entered the Order of March 2, 1981 specifically directing the defendants to transfer to the community certain numbers of retarded persons by certain dates. The Order required the defendants to transfer: 61 retarded Pennhurst residents from the Southeast Region by June 30, 1981; 150 additional Southeast Region Pennhurst residents by June 30, 1982; 100 retarded persons from the Southeast Region including members of the plaintiff class by June 30, 1982; and 100 Pennhurst residents from outside the Southeast Region by June 30, 1982. As the Court noted in its Memorandum of March 2, 1981:

In formulating its implementation Order, the Court has arrived at the numbers of individuals to be placed in the community from the defendants' own proposals. The Commonwealth's letters of fund allocation to the defendant Counties for the fiscal year ending June 30, 1981, although making provision for less than half the number of placements proposed to the Court in May, 1980 (111, as opposed to 250), clearly indicate that the implementation Order is well within the capabilities of the defendants and the Court so finds. Likewise, on the basis of the defendants' proposals to the Court in May, 1980, the Court finds that the number of retarded individuals to be provided for in the community within the Southeast Re-

gion of Pennsylvania in the fiscal year ending June 30, 1982 (a total of 250) is well within the capabilities of the defendants. In addition, the transfer of Pennhurst residents from Counties outside the Southeast Region should not be further delayed. As heretofore pointed out, community placements have been proceeding much more rapidly in other areas of the state and on this basis the Court finds that its implementation Order directing the transfer of 100 Pennhurst residents to community facilities in counties outside the Southeast Region during the fiscal year ending June 30, 1982 is well within the Commonwealth's capabilities.

Memorandum of March 2, 1981 at 13.

The Commonwealth defendants have contended that the portion of the March 2, 1981 Order regarding the community placement of 100 Pennhurst residents outside the Southeast Region exceeds the Court's jurisdiction in that the Pennsylvania counties outside the Southeast Region are not parties to this action. Indeed, the Commonwealth defendants have made this contention since the inception of this litigation and this Court has repeatedly rejected their argument, beginning with its decision on the merits. *See* 446 F.Supp. at 1322–23. At trial, the Commonwealth defendants and the Southeast Region county defendants disputed their coordinate responsibilities under the Mental Health/Mental Retardation Act of 1966 to provide minimally adequate habilitation to the retarded citizens of Pennsylvania. This Court, in 1977, determined that both "the Commonwealth and the counties have been charged under the [1966] Act with the responsibility of providing such minimally adequate habilitation to the retarded." 446 F.Supp. at 1322. The Court then noted that the 1966 Act

> envisions 'a comprehensive cooperative State-county (or multi-county) program for the care, treatment and rehabilitation of persons who are . . . mentally retarded . . . . The State, through the Department of Welfare, is responsible for the overall supervision and control of the program to assure the availability of and equitable provisions for adequate . . .

mental retardation facilities, and the counties, separately or in concert, are assigned responsibilities as to particular programs.'

446 F.Supp. at 1322–23, *quoting Hoolick v. Retreat State Hospital*, 24 Pa.Cmwlth. 218, 221–22, 354 A.2d 609, 611 (1976), *aff'd*, 476 Pa. 317, 382 A.2d 739.

The Supreme Court of Pennsylvania subsequently adopted this interpretation of the 1966 Act in the case *In re Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981). The Supreme Court noted that

> It is evident that . . . the Act was intended to separate and yet coordinate State-county responsibilities to insure the availability of adequate mental retardation services for all of the residents of the States in need of such services. The State, through the [Welfare] Department, was given the responsibility for the overall supervision and control of the program. [Sections of the Act] impose the duty and grant the authority to ensure adequate services for the mentally retarded. [Under the Act] the State has the obligation to provide adequate mental health services and the Department is charged with the duty to implement that obligation.

429 A.2d at 635 (footnote omitted).

The Third Circuit, in its second *en banc* opinion in this case, noted that Pennsylvania's Mental Health/Mental Retardation Act of 1966, as interpreted by the Pennsylvania Supreme Court decision in *In re Schmidt, supra*, determined that "the state was given responsibility for overall supervision and control of the statutory program." 673 F.2d 628 at 654. Both the Third Circuit's decision of February 26, 1982 and *Schmidt* are replete with references to the Commonwealth's ability and responsibility to require the counties to provide adequate habilitation for the retarded.

The Court, nevertheless, on February 26, 1982, ordered a hearing on the Commonwealth defendants' supplemental motion in order to receive evidence as to their ability to comply with the March 2, 1981 Order.

The supplemental motion averred that compliance was impossible because they were "without sufficient funds to fund the creation, by June 30, 1982, of new community living arrangements for persons at Pennhurst whose county of origin lies outside the Southeast Region." (Supplemental Motion at 2).

■ At this hearing held on April 16 and April 19, 1982, the Court once again permitted the Commonwealth defendants to present their argument that this Court was without jurisdiction to order the transfer of 100 Pennhurst residents from counties outside the Southeast Region. Before turning to the factual issue of the Commonwealth defendants' ability to comply with the March 2, 1981 Order, the Court will first examine the contention that Pennsylvania counties outside the Southeast Region must be joined as parties to this action before the Court may order that the Commonwealth defendants provide for the transfer to the community of Pennhurst residents from those non-party counties. Rule 19 of the Federal Rules of Civil Procedure provides that a necessary party is one in whose absence "complete relief cannot be accorded among those already parties," or one who "claims an interest relating to the subject matter of the action [or] is so situated [that] his absence may as a practical matter impair or impede his ability to protect that interest." Based upon the evidence presented at the hearing, the Court finds that the Commonwealth defendants have sufficient control over all counties in the State such as to enable the Commonwealth defendants to comply with this Court's Orders. The Secretary of Public Welfare controls the annual allocations of mental health/mental retardation funds to each county. The Secretary also controls the annual reallocation of unspent-community services money from the preceding year, and she is obligated by statute to review and approve or disapprove the annual plans of each county or county-jointure. 50 Pa. Stat.Ann. §§ 4201(1)(2) and (6), 4509, 4512 (Purdon 1969). At the hearing on May 24, 1980, the Commonwealth defendants stated that, were any county not to perform as expected, the Commonwealth defendants themselves have the authority to develop and provide community programs. *See* N.T., May 30, 1980 at 74–77, 93–94. The Commonwealth's correspondence to the counties states that "Any deviation [by the counties] from the requirements of your county allocation [of funds for use under the Mental Health/Mental Retardation Act of 1966] are subject to Department [of Public Welfare] review and approval." *See* P–7; P–8.

■ The arguments concerning non-party counties presented by the Commonwealth defendants in their supplemental motion are nothing more than a rehash of arguments long ago rejected by this Court. It is obvious, therefore, that the Commonwealth defendants' insistence on restating this contention is being offered as an excuse for their failure to comply with the March 2 Order. Despite their contentions, the Commonwealth defendants have not sought to join the non-Southeast Region counties as parties to this action even though such joinder would not affect the jurisdiction and venue of this Court in this litigation. *See* 28 U.S.C. §§ 1391, 1392; *Sinwell v. Shapp*, 536 F.2d 15 (3d Cir. 1976). Furthermore, the Commonwealth defendants may not challenge the legality of this Court's Order by refusing to obey the order, but must raise their legal arguments on appeal after a proper post-trial motion has been denied. *Halderman v. Pennhurst*, 673 F.2d 628, 636–37 (3d Cir. 1982); *Thompson v. Johnson*, 410 F.Supp. 633 (E.D.Pa.1976), aff'd, 556 F.2d 568 (3d Cir. 1977).

This Court's Memorandum of March 2, 1981 noted in detail the long period of slow and sporadic community placement of the residents of Pennhurst between March, 1978 and March, 1981. *See* Memorandum of March 2, 1981 at 6. During that time, the population of Pennhurst declined from 1,156 to 972 at the end of August, 1980. Today, Pennhurst still houses more than 800 persons. The Court found that, during the 1980–81 fiscal year, there was little progress in community placement, despite

the fact that the Commonwealth defendants have, since the early months of 1980, represented that they wished to "exert every effort to expedite the transfer of the retarded residents of Pennhurst to the community." and to fully comply with this Court's Orders. Memorandum of March 2, 1981 at 6–7. However, this Court, on the basis of the evidence presented at the hearing of May 27, 1980, found that a specific implementation order setting specified levels of community placement was necessary in order to ensure that the retarded residents of Pennhurst received the statutory and constitutional rights to which this Court, in 1977, found them entitled.

At the May 27th, 1980 hearing, the Court was particularly dismayed to find that the community placements of Pennsylvania's retarded citizens were proceeding much more rapidly in areas of the state outside the Southeast Region. No satisfactory explanation of this paradoxical situation was ever offered to the Court. Despite the slow pace of community placement and habilitation, the Court remained optimistic that the Commonwealth defendants would comply with the reasonable requirements set forth in the March 2 Order.

At the contempt hearings commencing July 23, 1981, in connection with plaintiff's motion to find the Commonwealth and County defendants in contempt of the March 2, 1981 Order, the Commonwealth defendants represented to this Court a commitment to the basic thrust of this Court's Orders, i.e., that the education, training and care of retarded persons should be accomplished in community living arrangements. They also represented, in response to the March 2 Order, that they began planning to achieve compliance with the Order, meeting with the county defendants and instructing them that they "should leave no stone unturned with respect to the expeditious, thorough and professional implementation of Judge Broderick's March 2nd Order." (Testimony of Jennifer Howse, Deputy Secretary of the Department of Public Welfare for the Office of Mental Retardation, N.T. 3–24, 526 F.Supp. 414 at 419).

Against this backdrop, the Commonwealth defendants came into Court on April 16 and 19, 1982 and contended that they were unable to comply with that portion of the March 2 Order (Paragraph 3) requiring the Commonwealth defendants to provide for the transfer to the community of 100 Pennhurst residents from counties outside the Southeast Region of Pennsylvania because sufficient funds were not appropriated by the legislature. The evidence presented by the Commonwealth defendants failed to support their contention. Frankly, the evidence shows that sufficient funds are available. On the basis of the testimony of Dr. Howse, the Deputy Secretary of the Department of Public Welfare for Mental Retardation, and various internal documents of the Department of Public Welfare, the Court finds that the reason the Commonwealth defendants have not initiated the transfer of Pennhurst residents from outside the Southeast Region into the community is not because they were without funds, but because they considered other projects to merit greater priority than this Court's Order that the residents of Pennhurst be placed in community facilities. In short, the Commonwealth defendants have, since the March 2, 1981 Order, acted as though the Order had never been issued and administered the funds appropriated by the legislature for community living arrangements in total disregard of the Court's Order of March 2, 1981.

The evidence presented at the hearing shows that the Commonwealth defendants at no time requested an appropriation of specific funds to comply with this Court's Orders. However, the legislature did appropriate $164,924,000 for community services for the mentally retarded. The Commonwealth defendants presented no reason to this Court why they could not use a portion of these funds to implement Paragraph 3 of this Court's Order of March 2, 1981, except their statement to the Court that they considered other uses of the money to have merited a higher priority.

The evidence presented at the April 16, 1982 hearing shows that the Department of

Public Welfare Secretary possesses wide discretion in the use of these monies appropriated for community services for the mentally retarded. Thus, the question before this Court is not whether the Commonwealth defendants received all that they had asked of the legislature, but, given the appropriation they actually received, whether the Commonwealth defendants possessed sufficient funds to comply with Paragraph 3 of the March 2 Order. The uncontradicted evidence presented at the April 16 hearing shows that they had control over funds far in excess of what was required to comply with Paragraph 3 of the March 2, 1981 Order.

The Commonwealth defendants have been aware of their responsibilities to comply with Paragraph 3 since March 2, 1981. On June 15, 1981, they submitted to this Court, pursuant to the Court's Order, a "Plan for the Implementation of the March 2, 1981 Court Order" in which they identified 100 Pennhurst residents from outside the Southeast Region who were to be provided with community living arrangements. At that time, the Office of Mental Retardation stated that it would "request" the home counties of these 100 Pennhurst residents to place these persons into community facilities. In addition to this plan, the Commonwealth defendants have, on numerous occasions, represented to this Court their desire to implement the March 2 Order. *See* Memorandum of September 11, 1981, 526 F.Supp. 414, 419–20. At a hearing before this Court on October 19, 1981, for example, Deputy Secretary of the Department of Public Welfare Howse testified that "[O]ur [the Department of Public Welfare's] first priority on carry-over funds [funds appropriated to DPW but not spent during the fiscal year] ... would be for those individuals [at Pennhurst who are from counties outside the Southeast Region]." At the April 16 hearing, Dr. Howse testified that the Department of Public Welfare had available between July 1, 1981 and April 15, 1982 more $2.5 million in such certified carryover funds. At no time during the 1981–82 fiscal year has Department of Public Welfare Secretary Helen O'Ban-

non or Dr. Howse recommended the use of these carryover funds for the purpose of complying with this Court's Order of March 2, 1981. Secretary O'Bannon has, however, allocated more than $2.5 million dollars in carryover funds to a variety of other projects. For example, $831,000 was given to Allegheny County for the purpose of closing the C. Howard Marcy State Center for the Mentally Retarded ("Marcy") by transferring its retarded residents to community facilities.

Dr. Howse also testified that an additional $1.4 million in carryover funds will be available for distribution prior to June 30, 1982. In addition, internal Department of Public Welfare memoranda indicate that the Department had available, as of February 26, 1982, an additional $1,092,659 in funds other than carryover funds that could be used to provide community services. However, the Commonwealth defendants have not committed this money for a specific purpose. The Commonwealth defendants could, if they so chose, use these funds to comply with Paragraph 3 of the March 2, 1981 Order (*See* Exhibit P–20).

The amounts heretofore discussed are only a portion of the funds available to the Commonwealth defendants that could have been used to implement this Court's Order of March 2, 1981. During the early part of fiscal year 1981–82, the Office of Mental Retardation had available to it $10.2 million in federal funds for the Department's use in fiscal 1981–82. Dr. Howse made recommendations for the use of these funds. Secretary O'Bannon approved these recommendations on August 30, 1981. Again, there was no suggestion that this money could be used to comply with the March 2 Order to transfer non-Southeast Region Pennhurst residents to the community facilities. More than $2.9 million of these federal funds were used to effectuate the closing of Marcy Hospital by transferring its residents to the community. Marcy was not closed as a result of any court order, but was apparently considered by Dr. Howse and Secretary O'Bannon to have a higher priority than the community placement of Pennhurst resi-

dents.[1] In fact, 148 Marcy residents have been provided with community living arrangements and programs while only 1 of the 100 non-Southeast Region Pennhurst residents subject to the March 2 Order has received the benefits of habilitation in the community.

Secretary O'Bannon has retained $577,000 of the excess federal funds for use "where critical needs may exist during the [fiscal] year." Apparently, the Secretary does not consider compliance with this Court's Order of March 2, 1981 to be a "critical need", since not one penny of this $10.2 million surplus available to the Commonwealth defendants has been used to implement Paragraph 3 of the March 2 Order.

Dr. Howse testified that the Commonwealth defendants had available $3.5 million in a line appropriation for the Pennhurst budget and that some of these funds were used to contract with private care providers for community services to Pennhurst residents in the five Southeast Regional counties (*See also* P–14, p. 2, P–13, Deposition of Dr. Howse, P–22, pp. 57–67). However, none of this money has been used to provide community living arrangements or services for any of the 100 non-Southeast Region Pennhurst residents under the March 2, 1981 Order. Meanwhile, the Commonwealth defendants allocated $1.9 million of the $3.5 million to counties in Western Pennsylvania for the community placement of 148 residents of Marcy Hospital. None of the millions of dollars available for use at the discretion of the Commonwealth defendants has been used to implement Paragraph 3 of the March 2 Order.

Thus, on the basis of the evidence presented at the hearings held April 16–19, 1982, this Court finds that, although the Commonwealth defendants have had millions of dollars in funds which could have been used by them to comply with Paragraph 3 of the March 2 Order during fiscal 1981–82, they failed to allocate any of these funds for compliance with Paragraph 3 of the March 2, 1981 Order. Furthermore, each month during the 1981–82 fiscal year, there were approximately 35 to 40 vacancies in community living facilities outside the Southeast Region. (*See* Exhibit P–1). These facilities were available to receive Pennhurst residents, had the Commonwealth defendants used their discretion and directed that these vacancies be utilized for Pennhurst residents from the counties where the vacancies existed.

The Court, on the basis of the evidence presented at the hearings, finds that the average cost per person is approximately $36,500 to establish a community living arrangement for a retarded person and to provide that retarded person with adequate habilitation services for one year. After the first year, the average cost per person is approximately $27,500 to maintain the person in a community facility for one year. It appears, therefore, that assuming the Commonwealth defendants had transferred 100 non-Southeast Region Pennhurst residents to the community on July 1, 1981 and provided them with full services through June 30, 1982, the approximate cost of their fully complying with Paragraph 3 of the March 2 Order would have been $3.65 million.

Of course, this Court's Order did not direct, nor did this Court expect, that all 100 non-Southeast Region Pennhurst residents would be moved to community living arrangements overnight. Mindful of the practical realities of arranging transfer and adequate habilitation, the March 2 Order directs only that the Commonwealth defendants effect the transfers to the community during the fiscal year 1981–82. Thus, a more realistic assumption would have been that the average length of stay in a community living arrangement during fiscal 1981–82 for the 100 non-Southeast Region residents would have been about six months and the cost to the Commonwealth

---

1. The Court is not critical of the Department's decision to provide community living arrangements for retarded individuals institutionalized in Allegheny County. However, no acceptable explanation has ever been provided to this Court as to why the Commonwealth appears committed to providing community living arrangements for the retarded residents of Western Pennsylvania while proceeding to ignore the residents of Pennhurst.

would have been only $1.8 million. Whatever the cost, it is apparent that implementation of this Court's March 2, 1981 Order could have been accomplished by the Commonwealth defendants and the Court so finds.

Furthermore, the evidence submitted at the April hearing shows that the Commonwealth might save substantial sums of money by complying with the March 2 Order. As heretofore noted, it costs approximately $36,500 to provide a retarded citizen with transfer to a community living arrangement and habilitation services for one year, and $27,500 for each succeeding year. *See* Exhibit P–24. According to the evidence presented at the hearing, the per capita cost for each retarded person at Pennhurst is $51,500 per year. Although the Commonwealth defendants are apparently convinced that the per capita costs of providing adequate habilitation in community living arrangements are far less than the per capita costs of providing similar services in institutions, the Commonwealth defendants have nonetheless appeared reluctant through the years to provide community living arrangements for the Pennhurst residents. *See* Exhibit P–10.

The Commonwealth defendants seem aware of the economic benefits of deinstitutionalization. Their own reports concerning the deinstitutionalization of Marcy Hospital estimated that the Commonwealth would save more than $3.2 million by closing Marcy and transferring its residents to appropriate community facilities. The Commonwealth expects that the costs of services to the Marcy residents can be cut in half through deinstitutionalization. *See* Exhibit P–10 at 7. According to a report of the Commonwealth defendants "residents of C. Howard Marcy State Center can be placed in less restrictive environments in the community at significantly lower costs than the continued operation of Marcy." *Id.* at 8. Ironically, the Commonwealth defendants have vigorously sought fiscal economy and improved habilitation for Marcy residents, who are not subject to a federal court order, but have failed to make similar efforts on behalf of Pennhurst residents.

While the Commonwealth defendants chose not to expend discretionary funds for community placements as ordered by this Court, they spent more than $42.5 million to operate Pennhurst Center during fiscal 1981–82. Included in this budget was $1.4 million for capital improvement projects, such as central air-conditioning ($1 million), air-conditioning in the kitchen ($46,000), expanded computer software ($15,000), soft water ($7,000), and cesspool servicing ($5,000).

George Kopchick, Superintendent of Pennhurst Center, testified that the fixed costs of operating Pennhurst would decline markedly when the population of the institution fell below 800. *See* Hearing of October 19, 1981. Therefore, by effectuating the 100 ordered transfers, the Commonwealth defendants would have reduced the retarded population at Pennhurst to 740 persons, thereby making additional funds available to comply with the March 2 Order.

The Court also finds, on the basis of the evidence presented at the April 16 hearing, that the Commonwealth defendants are failing to fully utilize the federal funds available for providing community living for the retarded. The United States Government administers, through Title XIX of the Social Security Act, 42 U.S.C. § 1396d(d), a program which makes available to states one-half of the funds required to operate an approved intermediate care facility for the mentally retarded ("ICF/MR"). In order to receive these matching funds, a state must first ensure that the facilities in question meet the federal government's standards to qualify for ICF/MR funding. Many other states are meeting these standards and obtaining ICF/MR funds on a much greater scale than Pennsylvania. The federal government requires a minimum of four residents in an ICF/MR. However, most of the community living arrangements to which Pennhurst residents have been transferred contain three residents and thus are not eligible for ICF/MR funding. If these and other community facilities in Pennsylvania

were eligible for ICF/MR federal funds, the state's cost of operating community living arrangements would be substantially reduced. Only 27 community living arrangements in the Southeast Region were converted to ICF/MR status during fiscal 1981–82.

The Commonwealth defendants have never questioned the basic thrust of this Court's determination that adequate habilitation of the retarded residents of Pennhurst should be accomplished in the less restrictive setting of a community living arrangement. Indeed, they appear to be pursuing and accomplishing deinstitutionalization of the mentally retarded at a much faster pace everywhere but at Pennhurst. The closing of Marcy Hospital and the Harrisburg MR unit were done at a much faster pace. Yet, somehow, the Commonwealth defendants once again appear dedicated to the proposition that compliance with the Orders of this Court concerning Pennhurst should be at the slowest possible pace. Clearly, they have presented no reason which persuades this Court that they cannot transfer the 100 non-Southeast Region residents of Pennhurst, as ordered in Paragraph 3 of this Court's Order of March 2, 1981.

As of this date, it is obvious that the Commonwealth defendants cannot effectuate meaningful transfer of the 100 non-Southeast Region residents prior to the June 30, 1982 deadline set forth in the March 2, 1981 Order. As this Court has stated previously, it is reluctant to consider contempt proceedings against any defendant. Specifically, this Court has stated,

In the event that in the future there is an unacceptable failure to comply with the Orders of this Court, it may be necessary to consider contempt proceedings. The Court is reluctant to consider such a course, but the Court cannot neglect its duty to assure the rights of the mentally retarded to adequate habilitation in the least restrictive environment—rights which were declared more than three years ago, but which many retarded persons in the plaintiff class have yet to enjoy.

Memorandum of March 2, 1981 at 13. In order to give the Commonwealth defendants an opportunity to avoid a contempt hearing, this Court will *sua sponte* amend Paragraph 3 of the March 2, 1981 Order to give the Commonwealth defendants an additional 90 days, *i.e.*, until September 30, 1982, to transfer the 100 Pennhurst residents from counties outside the Southeast Region to community living arrangements. An appropriate order will be accordingly entered.

## ORDER

AND NOW, this 11th day of June, 1982, upon consideration of the Commonwealth defendants' Motion to Amend And/Or Alter this Court's Order of March 2, 1981, filed with this Court on February 4, 1982, a hearing having been held on this motion on April 16 and 19, 1982, for the reasons set forth in this Court's Memorandum of June 11th, 1982,

IT IS HEREBY ORDERED:

1. The Motion of defendants Commonwealth of Pennsylvania Department of Public Welfare and its Secretary the Honorable Helen O'Bannon to Amend And/Or Alter This Court's Order of March 2, 1981, filed with this Court on February 4, 1982, is DENIED;

2. Paragraph 3 of this Court's Order of March 2, 1981 is AMENDED to read:

3. The Commonwealth defendants shall provide community living arrangements together with all the services required by the retarded person's Individual Habilitation Plan for at least 100 Pennhurst residents (not covered by the School-Age Order) from Counties outside the Southeast Region of Pennsylvania by September 30, 1982.