**Terri Lee HALDERMAN, et al., Plaintiffs,**

v.

**PENNHURST STATE SCHOOL AND HOSPITAL, et al., Defendants,**

**United States of America, Plaintiff-Intervenor,**

**Pennsylvania Association for Retarded Citizens, et al., Plaintiffs-Intervenors.**

**Civ. A. No. 74–1345.**

United States District Court, E.D. Pennsylvania.

Jan. 14, 1983.

David Ferleger, Herbert B. Newberg, Philadelphia, Pa., for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for the Com. of Pennsylvania.

Thomas Gilhool, Public Interest Law Center, Philadelphia, Pa., for Pennsylvania Ass'n for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., for David Ferleger.

Pamela P. Cohen, Philadelphia, Pa., for Pennhurst Parents Ass'n.

Terisa Chaw, Civil Rights Div., Dept. of Justice, Washington, D.C., R. Stephen Barrett, Asst. County Sol., Norristown, Pa., for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM AND ORDER

RAYMOND J. BRODERICK, District Judge.

Though the defendants in this litigation have been required by Court Order for more than 5 years to provide the members of the plaintiff class with minimally adequate habilitation in the least restrictive environment, the placement of these retarded citizens into such adequate habilitation environments is being accomplished at a very slow pace. On March 2, 1981, this Court was forced to enter an Order mandating the community placements of a specific number of class members between March 2, 1981 and June 30, 1982. At this juncture, the modest requirements of the March 2, 1981 Order still have not been fulfilled. During September and October, 1982, this Court held a hearing concerning the defendants' plans for placing class members in adequate community facilities during fiscal years 1982–1983 and 1983–84 (through June 30, 1984) (hereinafter the "September hearing"). Based on the evidence presented at the hearing and the record in this case, the Court has reluctantly concluded that it must again issue an Order requiring the defendants to provide a specified minimum number of community placements during the next 18 months.

The Order which this Court will enter does not, however, set requirements that will be difficult for the defendants to meet. In fact, the requirements of the Order are consistent with the County defendants' own proposals for community placements during the 1982–83 and 1983–84 fiscal years. The Commonwealth defendants, however, in the plan which they submitted to the Court, apparently have no present intention to fund the County defendants' proposals during the 1982–83 fiscal year and plan to fund only 150 class member placements during fiscal 1983–84, contingent upon receiving federal funds pursuant to the 2176 waiver of Title XIX of the Medicaid Program.

To facilitate understanding of the Court's decision regarding 1982–83 and 1983–84 fiscal year community placements of the class members, the Court will first review the

history of this matter, particularly the enforcement Orders of the Court entered to ensure compliance with the primary injunctive Order, and will also review the defendants' past opposition and occasional defiance of the Court's Orders.

*History of the Litigation*

As is well-known to the litigants, this case began in 1974 as a class action in which the named plaintiffs, retarded persons (the "Pennhurst class") who were either residents of Pennhurst State School and Hospital ("Pennhurst") or on the waiting list for residence at Pennhurst as of May 30, 1974, claimed injury based on violations of certain state and federal statutes and the United States Constitution in connection with their institutionalization at Pennhurst. At trial, all parties, including the Commonwealth defendants as well as the other defendants, agreed that Pennhurst as an institution was inappropriate and inadequate for the habilitation of mentally retarded citizens, and that the retarded should be educated, trained, and cared for in community living arrangements. The defendants insisted, however, that they be permitted to accomplish the community placement of Pennhurst residents pursuant to their own schedule. The Court found this "schedule" to be vague and indefinite. On December 23, 1977, this Court issued findings of fact and conclusions of law (Memorandum of December 23, 1977, 446 F.Supp. 1295) which found that the defendants were violating the constitutional and statutory rights of the Pennhurst Class by failing to provide them with minimally adequate habilitation in the least restrictive environment. This holding has been affirmed on two occasions by the United States Court of Appeals for the Third Circuit, sitting en banc. The legal bases for its affirmances were predicated upon federal and state statutes; the constitutional violations found by this Court have not as yet been directly addressed by either the Third Circuit or the United States Supreme Court.

On January 6, 1978, this Court held a hearing to determine the injunctive relief necessary to remedy the violations. The parties were asked to attempt to agree on the terms of the Court's order, but no agreement was forthcoming. On March 17, 1978, the Court issued an injunctive Order setting forth the relief to which the retarded residents of Pennhurst were entitled (446 F.Supp. at 1326).

This Court further ordered that Individual Habilitation Plans be developed for each member of the plaintiff class, that appropriate community monitoring mechanisms be designed and implemented, that a friend-advocate system be established to represent those class members who were without family or guardian, and that a Special Master be appointed to monitor the defendants' planning and implementation activities and report to the Court on the defendants' compliance with the Court's Orders.

The Order of March 17, 1978 was appealed to the Third Circuit however, defendants' application for a stay of the Order was denied. During the pendency of the appeal, this Court issued three major Orders in this case. One of these, the Order of June 8, 1979, set forth a specific timetable for the transfer to the community by September 1, 1979 of the approximately 55 school-age residents of Pennhurst. This Order was necessary because only three school-age residents of Pennhurst had been placed in community living arrangements between March 17, 1978, the date of the Court's original injunctive Order, and June 8, 1979. As of April 22, 1982, 14 of the school-age residents covered by the Order of June 8, 1979 still had not been transferred to community living arrangements (Report of the Special Master, April 22, 1982).

On December 13, 1979, the Court of Appeals issued an Order substantially affirming this Court's Order of March 17, 1978, and remanding the matter to this Court for further proceedings. *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84. This Court, pursuant to the remand order, established an impartial hearing procedure and appointed a Hearing Master to provide the individual determinations mandated by the Circuit Court for Pennhurst residents being placed into the community,

and for other retarded members of the class being recommended for admission to other state institutions for the mentally retarded.

The United States Supreme Court granted *certiorari* in this case on June 10, 1980, and on June 30, 1980 entered a limited stay order which, in effect, allowed only "voluntary" transfers of Pennhurst residents to the community pending final disposition of the matter. On July 14, 1980, this Court ordered the Hearing Master to hold a hearing for each Pennhurst resident for whom a community living arrangement had been prepared, for the purpose of determining whether the proposed transfer from Pennhurst to the community was "voluntary." On December 1, 1980, the Supreme Court declined to disturb this Court's interpretation and application of its stay order. On February 22, 1982, this Court granted the Commonwealth defendants' motion to discontinue voluntariness hearings on the ground that the stay order requiring such hearings was dissolved by the Supreme Court's subsequent decision on the merits. *See* Memorandum and Order of February 22, 1982.

On April 20, 1981, the United States Supreme Court reversed the Third Circuit's determination that the Bill of Rights for the Handicapped contained in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010, created in favor of the mentally retarded a substantive right to appropriate habilitation and treatment in the least restrictive environment. The Supreme Court remanded this case to the Third Circuit for consideration of the federal Constitutional and statutory issues as well as the state law questions raised by this Court in its Memorandum of December 23, 1977 (451 U.S. 1, 29–32, 101 S.Ct. 1531, 1546–47, 67 L.Ed.2d 694).

On February 26, 1982, the Third Circuit, pursuant to the Supreme Court's remand, issued its second *en banc* decision in this case. The Third Circuit again affirmed, holding that Pennsylvania's Mental Health Mental Retardation Act of 1966, 50 Pa.Stat. Ann. §§ 4101–4704 (Purdon 1969), granted Pennsylvania's retarded citizens the right to adequate habilitation in the least restrictive environment. Although the Supreme Court again granted certiorari on June 21, 1982, there is no stay of this Court's Orders mandating the community placement of those Pennhurst residents whose individual habilitation plans require community living arrangements in order to provide for their adequate habilitation. (Orders of March 17, 1978; June 8, 1979; April 24, 1980; March 2, 1981).

Based on the evidence presented at the trial of this case, the Court found, and the defendants admitted, that Pennhurst, in 1977, did not "meet the minimum standards for the habilitation of its residents." (446 F.Supp. at 1302). The Court also found that Pennhurst was overcrowded and understaffed and without the programs which the experts considered necessary for minimally adequate habilitation. The evidence showed that a large number of Pennhurst residents had actually experienced a regression of basic living skills as a result of their confinement at Pennhurst. All parties to the litigation agreed that Pennhurst as an institution was inappropriate and inadequate for the habilitation of the retarded. (446 F.Supp. at 1304). Programming and training of the retarded Pennhurst residents was found to fall far short of the minimum required for adequate habilitation according to the uncontradicted expert testimony of habilitation professionals. (446 F.Supp. at 1304). Not only was the habilitation then inadequate, but Pennhurst had no plans for improving the programming available to its residents. (446 F.Supp. at 1305).

Furthermore, the evidence presented at trial clearly showed that Pennhurst residents were not only receiving inadequate habilitation but also were regularly subjected to a number of dehumanizing practices. Specifically, this Court found that at Pennhurst restraints were used as control measures in lieu of adequate staffing. (446 F.Supp. at 1306). The Court further found that psychotropic drugs at Pennhurst were used for control and not for treatment, and the rate of drug use on some of the units at

Pennhurst was extraordinarily high. (446 F.Supp. at 1307). Regarding treatment at Pennhurst, the Court found that the environment at Pennhurst was not only not conducive to learning new skills, but it was so poor that it contributed to the loss of skills already learned. (446 F.Supp. at 1308). One survey showed that more than one-third of the Pennhurst Residents had "some notation of regression in their records." (446 F.Supp. at 1308, n. 40). Pennhurst, at the time of trial, was in fact a dangerous place to live. "Injuries to residents by other residents and through self-abuse, were common. . . . In addition, there [was] some staff abuse of residents." (446 F.Supp. at 1308–09). The Court also found that many of the residents suffered physical deterioration and intellectual and behavioral regression during their residency at Pennhurst. (446 F.Supp. at 1309).

Based upon the uncontradicted evidence presented at trial, the Court found that

Since the Early 1960's there has been a distinct humanistic renaissance, replete with the acceptance of the theory of normalization for the habilitation of the retarded. Mason & Menolascino, *supra,* note 6, at 136. [*The Right to Treatment for Mentally Retarded Citizens: An Evolving Legal and Scientific Interface,* 10 Creighton L.Rev. 124 (1976)]. The principles of normalization are an outgrowth of studies showing that those in large institutions suffered from apathy, stunted growth and loss in I.Q., and that the smaller the living unit on which the retarded individual lived, the higher the level of behavioral functioning shown by the individual. (Roos, N.T. 1–96 to 1–104). Under the principles of normalization, the retarded individual is treated as much like the non-retarded person as possible. (*Id.,* N.T. 1–106, 1–107). The basic tenet of normalization is that a person responds according to the way he or she is treated. (Glenn, N.T. 5–186, 5–187). The thrust of habilitation through normalization is the remediation of the delayed learning process, so as to develop the maximum growth potential by the acquisition of self-help, language, personal, so-cial, educational, vocational and recreation skills. Mason & Menolascino, supra, note 6, at 139–140. The older theories of habilitating the retarded stressed protecting the individual, and were characterized by little expectation of growth. Given this lack of expectation, the individual rarely exhibited growth. However, once removed from depressing, restrictive routines, the retarded have been able to accomplish a great deal. (Dybwad, N.T. 7–160).

The environment at Pennhurst is not conducive to normalization. It does not reflect society. It is separate and isolated from society and represents group rather than family living. (Hirst, N.T. 7–124). The principles of normalization have been accepted by the administration of Pennhurst and by the Department of Public Welfare, which is responsible for the administration of programs for the retarded in the five county area (Youngberg, N.T. 22–171; Rice, N.T. 26–43 to 26–45; Bilyew, N.T. 24–13; Hirst, N.T. 7–120), and the current intention of the Department of Public Welfare is to transfer all residents from Pennhurst by the early 1980's. (Rice, N.T. 28–48).

The five county area (Bucks, Chester, Delaware, Montgomery and Philadelphia) has some community facilities providing for the education, training and care of the retarded covering all ages of retardation, including the profoundly retarded with multiple handicaps. (Girardeau, N.T. 4–140, 4–141). These community facilities have been an outgrowth of the acceptance of the principle of normalization and the rejection of institutions such as Pennhurst in connection with the habilitation of the retarded.

Many individuals now living at Pennhurst could be moved immediately into the community and would be able to cope with little or no supervision. (Settle, N.T. 6–126; Hirst, N.T. 7–116). All the parties in this litigation are in agreement that given appropriate community facilities, all the residents at Pennhurst, even the most profoundly retarded with multi-

ple handicaps, should be living in the community. (Dybwad, N.T. 7–68).

The primary limiting factor in the transfer of Pennhurst residents to community facilities has been the failure of the Commonwealth and its subdivisions to provide sufficient living units, vocational and day care facilities and other support services at the community level. Since fiscal year 1972, only 186 Pennhurst residents have been transferred from the institution directly into community living units. (Bilyew, N.T. 24–50); although 176 others were transferred from Pennhurst to other institutions during 1974 and 1975. (Clark, N.T. 21–170).

In November, 1970, Act 256 was signed by the Governor of Pennsylvania. This legislation appropriated twenty-one·million dollars for the purpose of planning, designing and constructing community facilities which would enable 900 Pennhurst residents to be transferred to the community. In 1971, the McDowell report was prepared at a cost of $68,000. It detailed the programs and services needed to support the 900 Pennhurst residents in the community and provided a blueprint for the implementation of the Act. (Samuels, N.T. 23–9, 23–10, 23–55). Though seven years have passed since the Act was signed, few of the facilities have become operational. The Department of Public Welfare now expects this program to be completed by 1980. (*Id.*, N.T. 23–44). Over eighteen million dollars of this fund remains unspent but is allocated to building these facilities. (Stipulation, N.T. 7–97). As of April 25, 1977, however, only 37 Pennhurst residents have directly benefitted from the Act. (Samuels, N.T. 23–80).

Comparable facilities in the community are generally less expensive than large isolated state institutions. Services can be purchased at regular rates, rather than at rates which must be paid to attract individuals to work in a setting like Pennhurst. (Conley, N.T. 11–107). The cost of running Pennhurst in 1976 was $27.8 million dollars, or $60 per resident per day. (*Id.*, N.T. 12–28). This does not include the fair rental value of the buildings at Pennhurst (estimated at $3–$4 per resident per day). *Id.*, N.T. 11–114). The statewide cost of community living arrangements in Pennsylvania for 1976 was $17.64 per individual per day. (PARC Exhibit 63, 64). Program services, which ⅓ of mentally retarded individuals would need, average approximately $10 per individual per day. (Conley, N.T. 11–116, 11–117). Moreover, keeping the retarded individual in the community makes it possible for him or her to get employment. (Settle, N.T. 7–4). The lifetime earnings of a mildly retarded individual often exceeds $500,000. (Conley, N.T. 12–32). For those with an I.Q. between 25 and 50, 45% of men and 12% of women earn about 20% of the average wage. (*Id.*, N.T. 12–31). When the retarded can work, the amount of financial support which society must provide decreases and the individuals may benefit society with the taxes they pay. Furthermore, the investment per individual at Pennhurst is primarily for warehousing and not for the individual's well-being or future planning, as is the case with community facilities. (*Id.*, N.T. 11–23, 11–24).

(446 F.Supp. at 1311–12 (footnotes omitted)). The Court also found that the procedure for funding treatment and habilitation of the retarded gave the county defendants a financial incentive—unrelated to the relative habilitative benefits—to place retarded citizens in Pennhurst rather than in appropriate community facilities (446 F.Supp. at 1312–13).

The overwhelming weight of the evidence presented at trial, evidence uncontradicted by the defendants, mandated but one course of injunctive relief—placing the residents of Pennhurst in the community living arrangements being planned by the Commonwealth and the counties for the habilitation of the retarded (446 F.Supp. at 1325–29). In its first en banc decision in this case, the Third Circuit determined that this Court's original injunctive order had been too broad in that it ordered that all members of the

plaintiff class be placed in appropriate community living arrangements and that Pennhurst eventually be closed. Said the Third Circuit:

It is probably true, as the trial court found, that in general institutions are less effective than community living arrangements in facilitating the right to habilitation in the least restrictive setting. There is ample testimony on the record indicating the shortcomings of institutions as places for habilitation.

But ... For some patients a transfer from Pennhurst might be too unsettling a move. Long-term patients, for example, may have suffered such degeneration in the minimum skills needed for community living that habilitation outside an institution is a practical impossibility.... We need not decide that issue here. All that we need recognize is that there may be some individual patients who, because of advanced age, profound degree of retardation, special needs or for some other reason, will not be able to adjust to life outside of an institution and thus will be harmed by such a change. The case must therefore be remanded for individual determinations by the court, or by the Special Master, as to the appropriateness of an improved Pennhurst for each such patient.

612 F.2d at 114.

In making these individual determinations, the Third Circuit directed that this Court engage in "a presumption in favor of placing individuals in [community living arrangements]", but "the special needs and desires of individual patients must not be neglected in the process." 612 F.2d at 115. This Court, therefore, in accordance with the Third Circuit's first en banc opinion, entered an order deleting those paragraphs of the March 17, 1978 Order which enjoined admissions to Pennhurst (Order of April 24, 1980). As heretofore noted, that Order also established and appointed the Hearing Master.

The evidence presented at trial established that the effective planning of procedures required to vindicate the rights of the retarded moving from Pennhurst to the community required a Special Master. The Master, pursuant to the Court's direction, was instrumental in drafting and formulating the procedures for structuring the methods by which mental retardation professionals, who are employees of the defendants, would plan for and effectuate the community habilitation of most Pennhurst residents. The Special Master was necessary to monitor the compliance of the defendants with this Court's Orders.

For example, the evidence presented at trial concerning the abuses occurring at Pennhurst indicated that an impartial, independent, outside monitor was necessary to ensure that the retarded residents were no longer restrained, drugged, or otherwise physically harmed. Similarly, it was imperative that the community facilities, which all parties agreed were the only viable alternative for providing minimally adequate habilitation to the plaintiff class, be monitored to make certain that they were safe, sanitary, and beneficial to the habilitation of the retarded. The Commonwealth and County defendants, because of their long record of ignoring the inadequacies of Pennhurst, could not be depended upon to monitor the conditions at Pennhurst and to plan for the minimally adequate habilitation of the Pennhurst class. The Court found that it was necessary to appoint an impartial expert—the Special Master—to monitor the implementation of the remedy designed to curtail the violations of the plaintiff's rights. Neither the Commonwealth nor the County defendants ever filed an objection with this Court concerning the appointment of the Special Master. In fact, at no time during the course of this litigation has any defendant requested this Court to alter, reduce, or eliminate the Office of the Special Master. The Commonwealth defendants have never filed a motion pursuant to Fed.R.Civ.P. 60(b) suggesting that changed circumstances have eliminated the need for the Special Master. The Commonwealth defendants have, however, committed contempt of this Court's Orders by refusing to fund the Office of the Special Master. *See* Memorandum of August

25, 1981, 533 F.Supp. 631. They appealed this Court's finding of contempt to the Third Circuit, which affirmed this Court's findings and conclusions on February 26, 1982 (673 F.2d 628). In its opinion, the Third Circuit suggested that the Commonwealth defendants could file a Rule 60(b) motion if they felt that changed circumstances had eliminated the need for the Special Master. No such motion has ever been filed with this Court by the Commonwealth defendants or any other party to this litigation.

As of March, 1978, the defendants had no program to develop individual habilitation plans for the retarded residents of Pennhurst. The defendants also lacked programs for inspecting the community living arrangements to be provided for the Pennhurst residents for whom such community facilities constituted the least restrictive environment in which they could receive minimally adequate habilitation through programs designed by retardation professionals.

For these heretofore discussed reasons, the Court, in its Order of March 17, 1978 (446 F.Supp. at 1326) established the office of the Special Master, fully intending that the Special Master's office would be a transitional entity, since the implementation of the injunctive relief ordered by this Court is ultimately the responsibility of the defendants. As this Court noted in its Memorandum of November 18, 1981, 526 F.Supp. at 433,

> It has never been the Court's intention that the Office of the Special Master become a permanent and continuous operation. This Court will not be reluctant to reduce the staff of the Special Master's Office whenever it is convinced that the Commonwealth and County defendants are moving with due diligence to effectuate the Court's Orders. As of the October 19th [of 1981] hearing, 870 people remained at Pennhurst. Whenever the Commonwealth and County defendants have provided living arrangements in the community for all Pennhurst residents, this Court would probably have no reason

to continue the monitoring functions of the Special Master. Unfortunately, as the record in this case reveals, the defendants have not been diligently carrying out their responsibilities to the Pennhurst residents as required by this Court's Orders. Compliance with this Court's Orders requires a monitor who is not subject to the jurisdiction and control of the defendants.

526 F.Supp. at 434.

The Special Master had also performed tasks that the Commonwealth defendants should have performed pursuant to this Court's Orders, such responsibilities as the review of the Individual Habilitation Plans (IHPs) and the inspection of the community living facilities to which Pennhurst residents were transferred. It was not until 1982 that the Commonwealth defendants began to assume these responsibilities. However, these developments, as well as others, convinced this Court that, despite the defendants' record of inadequate compliance, the need for the Special Master would soon no longer exist. On August 12, 1982 (see 545 F.Supp. 410) this Court directed that the Special Master prepare to phase out the Office of the Special Master by December 31, 1982. The Office of the Special Master ceased operation on December 31, 1982.

As heretofore noted, pursuant to the Court's basic injunctive orders (Orders of March 17, 1978 and April 24, 1980), an individual habilitation plan (IHP) must be designed for each retarded resident of Pennhurst for whom a community living arrangement is being considered. The IHP is developed by a team of retardation professionals working with the Pennhurst resident and the parent, guardian, or certified advocate of the Pennhurst resident.

Thus, pursuant to this Court's Orders, a group of mental retardation professionals designs an IHP for the Pennhurst resident. If the team concludes that the retarded citizen's minimally adequate habilitation requires community placement, a particular community facility is selected or established and the retarded person moves to the com-

munity facility for a preplacement visit during which his or her reaction to the setting and program can be assessed. Preplacement visits are required before the Commonwealth defendants approve an IHP.

As heretofore noted, the IHP is a plan specifically tailored to the needs of the retarded person. One purpose of a preplacement visit or visits is to afford an opportunity for a meaningful determination as to whether the community facilities being provided pursuant to the IHP are in accordance with the professionally set specifications of the plan. The Court again emphasizes that a preplacement visit or visits should not be made until the community living arrangements are completed and a determination has been made that the community living arrangement is safe, clean, and adequate, and that the services required to provide a beneficial program of habilitation are available. As the Circuit Court has cautioned, both this Court and the Hearing Master, as well as the Commonwealth defendants who now approve each IHP, must have assurances before ordering transfers to community living arrangements that the sanitary, staffing, and program deficiencies found at Pennhurst are not duplicated on a smaller scale in community living arrangements (*see* 612 F.2d at 116).

The transfer of retarded citizens from confinement at Pennhurst to habilitation in the community proceeded at snail's pace from 1978 through 1980. In early 1978, when this Court entered the injunctive order designed to provide to the retarded residents of Pennhurst their state statutory, federal statutory, and federal constitutional rights, the Court hoped and expected that the defendants would provide these rights to the retarded with a minimum of supervision and an absence of coercion. However, in the intervening years, the defendants had acted as though this Court never entered its decision but merely approved the defendants' trial position of community placement according to the defendants' own vague and uncertain schedule. For that reason, this Court, on May 27, 1980, held a

hearing on a Rule to Show Cause and after that hearing determined, among other things, that the Commonwealth defendants, based on the evidence presented at the hearing and upon their own representation, were capable of placing 360 Pennhurst residents and class members in community arrangements during the fiscal year commencing July 1, 1981 and ending June 30, 1982. In its Order of March 2, 1981, the Court ordered the Commonwealth defendants to effectuate such transfers on or before June 30, 1982.

The Order required the defendants to transfer: 61 retarded Pennhurst residents from the Southeast Region by June 30, 1981; 150 additional Southeast Region Pennhurst residents by June 30, 1982; 100 retarded persons from the Southeast Region including members of the plaintiff class by June 30, 1982; and 100 Pennhurst residents from outside the Southeast Region by June 30, 1982.

As the Court noted in its Memorandum of March 2, 1981:

In formulating its implementation Order, the Court has arrived at the numbers of individuals to be placed in the community from the defendants' own proposals. The Commonwealth's letters of fund allocation to the defendant Counties for the fiscal year ending June 30, 1981, although making provision for less than half the number of placements proposed to the Court in May, 1980 (111, as opposed to 250), clearly indicate that the implementation Order is well within the capabilities of the defendants and the Court so finds. Likewise, on the basis of the defendants' proposals to the Court in May, 1980, the Court finds that the number of retarded individuals to be provided for in the community within the Southeast Region of Pennsylvania in the fiscal year ending June 30, 1982 (a total of 250) is well within the capabilities of the defendants. In addition, the transfer of Pennhurst residents from Counties outside the Southeast Region should not be further delayed. As heretofore pointed out, com-

munity placements have been proceeding much more rapidly in other areas of the state and on this basis the Court finds that its implementation Order directing the transfer of 100 Pennhurst residents to community facilities in counties outside the Southeast Region during the fiscal year ending June 30, 1982 is well within the Commonwealth's capabilities.

Memorandum of March 2, 1981 at 13.

In spite of their clear legal duties, the Commonwealth defendants, on March 10, 1981, filed a motion asking this Court to alter or amend the Order of March 2, 1981 on the ground that the non-Southeastern Region counties were outside the scope of this Court's Orders and the Commonwealth's control. On February 4, 1982, the Commonwealth defendants filed a Supplemental Motion to Amend and/or Alter this Court's Order of March 2, 1981. This motion averred that compliance was impossible because the Commonwealth defendants were "without sufficient funds to fund the creation, by June 30, 1982, of new community living arrangements for persons at Pennhurst whose county of origin lies outside the Southeast Region." (Supplemental Motion at 2). A hearing was held on April 16 and 19, 1982 (hereinafter the "April hearing") in connection with the motion to alter or amend filed on February 4, 1982. Based on the evidence presented at the hearing, this Court found that the Commonwealth defendants possessed more than sufficient resources to implement paragraph 3 of the Court's Order of March 2, 1981 (see Memorandum of June 11, 1982, 542 F.Supp. 619). However, the Court amended the March 2 Order to give the Commonwealth defendants an additional 90 days (until September 30, 1982) to comply with the Order. Reports filed with the Court by the Commonwealth defendants and the Special Master indicate that the March 2 Order still has not been complied with fully. In its Memorandum of June 11, 1982, this Court also reiterated its legal and factual conclusion that the Commonwealth defendants possessed the authority under the 1966 Mental Health/Mental Retardation Act to place retarded Pennhurst residents in counties out-side the Southeastern Region of Pennsylvania even though those counties are not joined as defendants in this litigation. *See* Memorandum of June 11, 1982 at 10–11, 542 F.Supp. at 622–23 (1982).

This Court's Memorandum of March 2, 1981 noted in detail the long period of slow and sporadic community placement of the residents of Pennhurst between March, 1978 and March, 1981. *See* Memorandum of March 2, 1981 at 6. During that time, the population of Pennhurst declined from 1,156 to 972 at the end of August, 1980. Today, Pennhurst still houses approximately 700 retarded residents. The Court found that, during the 1980–81 fiscal year, there was little progress in community placement, despite the fact that the Commonwealth defendants have, since the early months of 1980, represented that they wished to "exert every effort to expedite the transfer of the retarded residents of Pennhurst to the community" and to fully comply with this Court's Orders. *See* Memorandum of March 2, 1981 at 6–7. However, this Court, on the basis of the evidence presented at the hearing of May 27, 1980, found that a specific implementation order setting specified levels of community placement was necessary in order to ensure that the retarded residents of Pennhurst received the statutory and constitutional rights to which this Court, in 1977, found them entitled.

At the May 27th, 1980 hearing, the Court was particularly dismayed to find that the community placements of Pennsylvania's retarded citizens were proceeding much more rapidly in areas of the state outside the Southeast Region. No satisfactory explanation of this paradoxical situation was ever offered to the Court. Despite the slow pace of community placement and habilitation, the Court remained optimistic that the Commonwealth defendants would comply with the reasonable requirements set forth in the March 2 Order.

After the entry of the March 2, 1981 Order, the Commonwealth and County defendants filed motions to alter, amend, or stay the March 2 Order. However, without

providing this Court an opportunity to rule on their motion, the defendants applied on April 16, 1981 to the Third Circuit for a stay of the March 2 Order. The Court of Appeals denied defendants' motion on May 26, 1981. On July 1, 1981, the plaintiffs, due to the almost complete absence of activity by the defendants to comply with the March 2 Order filed a motion for a finding of contempt. The plaintiffs alleged that the defendants (with the exception of Chester County) had not complied with the Order of March 2, 1981.

On July 7, 1981, the Court issued an Order to show cause why the Commonwealth defendants and Bucks, Delaware, Montgomery and Philadelphia Counties should not be held in civil contempt for their failure to comply with Paragraph 1 of this Court's Order of March 2, 1981. A hearing was held on July 23 and 24, and August 4, 11 and 12, 1981. Philadelphia County, on August 11, 1981, entered into a consent order with the plaintiffs. Based on the evidence presented at the Show Cause hearing, this Court in its Memorandum and Order of September 11, 1981 found that Bucks, Delaware, and Montgomery Counties were, as of June 30, 1981, "not in substantial compliance with Paragraph 1 of the Order of March 2, 1981 in that they violated their obligation to act diligently and with a steadfast purpose to comply with the Court's Order." *See* Memorandum of September 11, 1981 at 10, 526 F.Supp. at 422. However, because the counties, through a flurry of activity between June 30, 1981 and the entry of the September 11 Memorandum and Order had come close to compliance with the March 2, 1981 Order of this Court, and though the Court found the Bucks, Delaware and Montgomery defendants to be in contempt, it imposed only one sanction on these defendants, *i.e.,* that these defendants pay plaintiffs' counsel reasonable attorneys' fee for their efforts in prosecuting the contempt. Specifically, this Court held

> Although the Bucks County defendants, the Delaware County defendants, and the Montgomery County defendants were in civil contempt of the Court's Order, the

Court determined that the imposition of a civil fine was not necessary in that it would serve no coercive functions since these 3 counties are now in substantial compliance with the Court's Order of March 2, 1981, it is hereby ORDERED that the Bucks County defendants, the Delaware County defendants, and the Montgomery County defendants shall pay reasonable counsel fees and costs to the plaintiffs in connection with the preparation and trial of these contempt proceedings.

Order of September 11, 1981, at 2. This Order was affirmed by the Third Circuit, without opinion, on November 19, 1982.

In its September 11 Memorandum, the Court found that the Commonwealth defendants were not in civil contempt of the March 2 Order. *See* Memorandum of September 11, 1981 at 18–19, 526 F.Supp. 419–20 (1982). At this juncture, the Commonwealth defendants appeared to be acting diligently and with steadfast purpose to effectuate the Court's Orders. However, subsequent events are casting doubt as to whether the Commonwealth defendants are acting diligently to implement the injunctive relief to which the plaintiff class is entitled. The Commonwealth defendants, even though they had informed the Court on May 26, 1981 that they no longer wished to have the Court consider their motion to alter or amend the March 2, 1981 Order, took no action between that date and February 4, 1982 designed to effectuate paragraph 3 of the March 2 Order (requiring the community placement of 100 Pennhurst residents from outside the Southeast Region during the 1981–82 fiscal year). Instead, they merely filed a second "Supplemental" motion to alter or amend, raising the same previously rejected legal arguments and adding that they were now also lacking in funds for implementation. The evidence presented at the April, 1982 hearing showed the lack of funds argument to be meritless. As this Court found in its Memorandum of June 11, 1982, 542 F.Supp. 619, the Commonwealth defendants had ample funds to comply with the Order. They had, how-

ever, failed to earmark any of these funds for compliance with paragraph 3 of the March 2 Order. Instead, they had used money that could have been employed in satisfaction of their obligations under the Court Order to de-institutionalize mentally retarded citizens elsewhere in the state and to make capital improvements at large state institutions, including Pennhurst. As this Court observed in its Memorandum of June 11, 1982

> The evidence presented by the Commonwealth defendants failed to support their contention. Frankly, the evidence shows that sufficient funds are available. On the basis of the testimony of Dr. Howse, the Deputy Secretary of the Department of Public Welfare for Mental Retardation, and various internal documents of the Department of Public Welfare, the Court finds that the reason the Commonwealth defendants have not initiated the transfer of Pennhurst residents from outside the Southeast Region into the community is not because they were without funds, but because they considered other projects to merit greater priority than this Court's Order that the residents of Pennhurst be placed in community facilities. In short, the Commonwealth defendants have, since the March 2, 1981 Order, acted as though the Order had never been issued and administered the funds appropriated by the legislature for community living arrangements in total disregard of the Court's Order of March 2, 1981.

Memorandum of June 11, 1982 at 14, 542 F.Supp. at 624. This conduct of the Commonwealth defendants was a direct contradiction of Dr. Howse's 1981 contempt hearing testimony, at which time she stated that the Department would devote the highest priority to implementation of the March 2 Order.

Thus, after months of resistance, the Order of March 2, 1981 is in the process of being implemented. The entire series of events antedating and postdating the Order of March 2 demonstrates that, without the entry of specific Orders, the defendants have done little to comply with the primary injunctive Order which governs this case. *See* Memorandum of March 2, 1981; Memorandum of September 11, 1981 (526 F.Supp. 414); Memorandum of June 11, 1982 (542 F.Supp. 619); Memorandum of August 12, 1982 (545 F.Supp. 410). Nevertheless, this Court was at that time willing to believe that the defendants should be given every opportunity to set for themselves a reasonable timetable for the accomplishment of the objectives of the remedial relief ordered by this Court in 1978. For this reason, the Court, on August 12, 1982, ordered:

> The defendants shall submit to this Court, on or before September 15, 1982, their: (1) plans to provide community living arrangements together with all services required by the retarded person's individual habilitation plan for Pennhurst plaintiff class members (not covered by the School-Age Order) in the Southeast Region of Pennsylvania (Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties) during the period commencing October 1, 1982 and closing June 30, 1984; (2) plans to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for retarded persons in the Southeast Region of Pennsylvania who are not members of the Pennhurst plaintiff class for the period commencing October 1, 1982 and closing June 30, 1984; and (3) plans to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for Pennhurst plaintiff class members (not covered by the School-Age Order) from counties outside the Southeast Region of Pennsylvania during the period commencing October 1, 1982 and closing June 30, 1984; (4) plans designed to assure compliance with this Court's Order of April 24, 1980.

A hearing was held concerning the plans submitted by the defendants on September 29, and October 13, and 20, and 27, 1982. Based on the evidence presented at the hearing and the plans and representations of the defendants, the Court makes the following findings of fact.

*The Defendants' Capabilities During the 1982–83 and 1983–84 Fiscal Years*

In plans submitted to this Court prior to the hearing, the five counties of Southeastern Pennsylvania represented to this Court that they could competently provide community living facilities and habilitative services to 348 persons between now and June 30, 1984. At the hearing, the Counties reaffirmed this capability but emphasized that these placements were to a large extent contingent upon receipt of adequate funding from the Commonwealth defendants. As noted often times in this litigation, Pennsylvania's Mental Health/Mental Retardation Act of 1966 (the 1966 Act) sets forth the duties owed to the retarded citizens and makes responsibility for discharging those duties coordinate upon both the state and the counties (*see* 446 F.Supp. 1295; *In re Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981); *In re Sauers,* —— Pa.Cmwlth. ——, 447 A.2d 1132 (Pa.Comm.Ct. (1982)). In practice, however, this statutory mandate has translated into a procedure whereby the counties plan for and implement the community living and habilitation of the retarded citizen while the Commonwealth provides the County (or private care providers secured by the County) with funds adequate to accomplish the residential and habilitation objectives set forth in the retarded person's IHP.

Specifically, the County defendants have represented that they can, between now and June 30, 1984, provide community living and habilitation for plaintiff class members and others as follows. For fiscal year 1982-83 (July 1, 1982 to June 30, 1983), Bucks County proposes moving 9 Pennhurst residents and 15 other retarded persons to the community. Chester County proposes moving 8 Pennhurst residents and 22 other retarded persons. Delaware County proposes moving 15 Pennhurst residents and 15 other retarded citizens. Montgomery County proposes moving 13 Pennhurst residents and 18 others. Philadelphia County proposed no class member movement to the community during the 1982–83 fiscal year.

For fiscal year 1983–84 (July 1, 1983 to June 30, 1984), the counties made the following representations. Bucks County proposed to move no Pennhurst residents (because it would have transferred the last remaining Bucks County Pennhurst resident to the community during 1982–83) and 18 others. Chester County proposed moving 7 Pennhurst residents and 23 others. Delaware County proposed moving 15 Pennhurst residents and 15 others. Montgomery County proposed moving 13 Pennhurst residents and 17 others. Philadelphia County proposed transferring 63 Pennhurst residents and 62 other retarded citizens during 1983–84. *See* Dkt. Nos. 1565, 1566, 1569 (County Plans); Exhibit P–23 of hearing.

Summarized in tabular form, the plans submitted by the County defendants for 1982–83 through 1983–84 are:

Proposed Community Placements of Retarded Persons for Fiscal 1982–83:

|  | Pennhurst Residents | Others |
|---|---|---|
| Bucks | 9 | 15 |
| Chester | 8 | 22 |
| Delaware | 15 | 15 |
| Montgomery | 13 | 18 |
| Philadelphia | 0 | 0 |
| TOTAL: | 45 | 70 |

For Fiscal Year 1983–84:

|  | Pennhurst Residents | Others |
|---|---|---|
| Bucks | 0 | 18 |
| Chester | 7 | 23 |
| Delaware | 15 | 15 |
| Montgomery | 13 | 17 |
| Philadelphia | 63 | 62 |
| TOTAL: | 98 | 135 |

Total for 1982–83 and 1983–84 fiscal years: 348

The five Southeastern Pennsylvania counties have in the past demonstrated their ability to place similar numbers of retarded citizens in community living arrangements within this amount of time (approximately 18 months). Indeed, they have accomplished a proportionately greater number of placements in the course of seeking to comply with the March 2, 1981 Order of this Court. That Order required these counties to place 320 persons in community facilities within a 16-month period. As

heretofore noted (pp. 1154–1155, *supra*) the counties (with the exception of Chester County) initially dragged their feet regarding this Order, resulting in the contempt findings against Bucks, Delaware, and Montgomery Counties. However, as also heretofore noted, these counties showed themselves very capable of accomplishing planning and placement of the retarded when under the threat of contempt (pp. 1154–1155, *supra*). It is thus clear that the counties are capable of fulfilling the representations of their 1982–84 plans so long as they receive adequate funding from the Commonwealth defendants.

The Court further takes judicial notice of the fact that the placements previously implemented by the County defendants have, in the main, been successfully accomplished and have enabled the retarded residents of Pennhurst transferred to the community to enjoy a better life that offers them the chance of habilitation, training, and personal growth so that they may enjoy life as fully as their capacities permit. This Court notes that few complaints regarding community placements have been directed toward this Court or the Special Master. Indeed, many parents or relatives of plaintiff class members who were initially apprehensive about community placements have become ardent supporters of community habilitation in the least restrictive environment.

Systematic study of the progress of retarded citizens receiving habilitation in community facilities shows that the retarded residents of Pennhurst have made significant behavioral strides while in the community. In fact, all studies thus far presented to this Court show that Pennhurst residents placed in appropriate community living arrangements are, as each day passes, improving in habilitative skills. Their habilitation in the community stands in stark contrast to the finding in this record that an overwhelming number of the retarded at Pennhurst experienced a regression in life skills while at the institution. *See* 446 F.Supp. at 1308.

One recent study showed that former Pennhurst residents have, on average, exhibited an increase of nearly six points (on a 128-point scale) in their Behavior Development Survey (BDS) adaptive behavior score. *See* C. Feinstein, J. Lemanowicz, J. Conroy, *Progress of Clients in Community Living Arrangements: Class Members Compared to Others* (Sept. 19, 1981); (Plaintiff's Exhibit 10 at Hearing of December 8, 1982). *See also* 526 F.Supp. at 434.

A more recent Temple University Developmental Disabilities Center Study focused on habilitation in Chester County community facilities and found that former Pennhurst residents now residing in these community homes had exhibited a more than 15-point gain in their BDS adaptive behavior scores (on a 128-point scale) and an average .435 point gain in their BDS maladaptive behavior scores (on a 22-point scale; a higher BDS maladaptive behavior score indicates that the retarded citizen shows less maladaptive behavior). This recent study also showed that these former Pennhurst residents now receiving community habilitation also exhibited substantial gains in life skills as measured by other tests generally accepted by the scientific community but less widely employed than the BDS adaptive and maladaptive behavior scores. *See* Temple University Developmental Disabilities Center Evaluation and Research Group, *Pennhurst Class Members in CLAs: Report # 2: Chester County Monitoring,* July 8, 1982. (Exhibit E of Commonwealth Defendants' Exhibit 1, submitted at this Court's Hearing of December 8, 1982 regarding enforcement mechanisms necessary to replace the Office of the Special Master).

The progress displayed by former Pennhurst residents now receiving community habilitation has demonstrably altered the attitude displayed by their families toward community placement. A recent report commissioned as part of the *Longitudinal Study of the Court Order* begun by the U.S. Department of Health and Human Services in July, 1979 found that parental responses to questions concerning their view of their children's community habilitation "reveal a

dominant pattern of extreme satisfaction with the quality and benefits of the community residences, tempered by deep concerns about the future security and permanence of the arrangements." J. Conroy and A. Latib, *Family Impacts: Pre-Post Attitudes of 65 Families of Clients Deinstitutionalized June 1980 to May 1982,* August 31, 1982, Plaintiff's Exhibit 10 (presented at this Court's Hearing of December 10, 1982) at 1.

In particular, this report found that family attitudes toward community habilitation "changed sharply to more positive attitudes" toward community habilitation after these families had seen the progress made by their own children in community facilities. *Id.* at 8. Family satisfaction with community habilitation affected many aspects of family conduct. The report found that

> The respondents also reported that they enjoyed their visits to [community facilities to see their children]. They had found visits to Pennhurst 'scary' and were intimidated by converging crowds of retarded persons. Other respondents felt the [community] setting was conducive to bringing younger siblings for visits. Previously, parents had not wanted to expose their children to the large, hospital-like impersonal environment of Pennhurst.

*Id.* at 14.

Increased family satisfaction with community habilitation was recently displayed by a witness before this Court during the Court's Hearing of December 8, 1982 concerning enforcement mechanisms necessary to replace the Office of the Special Master. Mr. Leon Beeson recently testified that he and his wife were initially opposed to community placement. However, when they saw the vast strides being made by their son in community facilities, they became advocates of community placement. In particular, Mr. Beeson observed that his son was making habilitative gains in his community home and day program that he had been unable to make during his many years of confinement at Pennhurst. The Reports of the Hearing Master also show many par-

ents to have become converts to community placement after seeing their children make rapid habilitative progress during only the short preplacement visits conducted pursuant to the development of individual habilitation plans. William McKendry, mental retardation program administrator for Chester County, testified at the December hearing that parental satisfaction with the county-placement of Pennhurst residents into community living arrangements was widespread. *See also* Memorandum of September 11, 1981, 526 F.Supp. at 422. This Court, on the basis of the overwhelming evidence contained throughout the record in this case, finds that the county defendants are capable of effectuating 348 quality community placements of retarded citizens during the 1982–83 and 1983–84 fiscal years.

The Court notes that, after these planned transfers take place, Bucks County will no longer have any retarded citizens residing at Pennhurst. Chester, Delaware and Montgomery Counties will, after effectuating their planned transfers, have only a few of their retarded citizens remaining at Pennhurst. The plans submitted by the County defendants demonstrate that the primary goal of this Court's Orders can be accomplished expeditiously when the defendants make sincere efforts to implement the Court's Orders.

Despite the expressed capabilities of the County defendants, however, the Commonwealth defendants failed to request funds in their proposed budget for 1983–84 for the County defendants' planned placement of plaintiff class members in the community. In fact, the evidence presented at the hearing shows that the Commonwealth defendants have no plans at present to seek such funding in their proposed budget request to the Governor's office for 1983–84. It was testified that when the Governor's office informed the Commonwealth defendants that their budget should be trimmed, they did not bring to the governor's attention the need to effectuate community placements in order to comply with this Court's Orders in this litigation.

■ The evidence presented at the September hearing also shows that the Commonwealth defendants not only failed to seek funding to implement the plans of the County defendants but also failed to even consult with the Counties as to the Counties' capabilities for community placements. This course of Commonwealth defendants conduct is highly unusual in light of the defendants' joint responsibilities under the Mental Health/Mental Retardation Act of 1966. Pursuant to the Pennsylvania Supreme Court decision of *In re Joseph Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981), both the Commonwealth and the Counties are jointly responsible for the community habilitation of the state's retarded citizens. The County defendants have begun to fulfill their responsibilities under the Act and the Court's Order for the 1982–83 and 1983–84 fiscal years by planning for the community habilitation of a reasonable number of class members during those fiscal years. The Commonwealth defendants, pursuant to the Orders of this Court, have not diligently planned for the funding required by the Counties to provide community facilities for the Pennhurst plaintiff class. This the Commonwealth defendants had not done at the time of the September hearing.

The Commonwealth defendants testified that they had no plan to provide any community placements in the Southeast Region during fiscal 1982–83. Their sole plan is to provide 150 placements during 1983–84, contingent upon the receipt of federal funds pursuant to the 2176 waiver program of Title XIX of the Medicaid Program. The Commonwealth defendants submitted a plan (*see* Dkt. No. 1559) which envisions placing 50 Pennhurst residents from outside the Southeast Region in community living arrangements (funded 100 percent by the state) and placing 100 class members—80 Pennhurst residents and 20 others—in community living arrangements eligible for 55 percent federal funding pursuant to Section 2176 of the Omnibus Budget Reconciliation Act of 1981, 42 U.S.C. § 1396n(c)–(f) during the 1983–84 fiscal year. All of the Southeast Region community placements pro-

posed by the Commonwealth defendants during the 1982–83 and 1983–84 fiscal years would occur in Philadelphia County only during 1983–84. According to the Commonwealth defendants' plan and testimony at the September hearing, this limited planning is contingent on receiving federal approval to operate facilities for these persons pursuant to the 2176 waiver. As heretofore noted, the Commonwealth defendants have submitted no plan for the community placement of Pennhurst residents from the Southeast Region during the 1982–83 fiscal year.

At the September hearing, the Commonwealth defendants testified that their decisions regarding compliance with the Court's Orders were based on political considerations and that these considerations were a primary factor in their community placement plans for fiscal 1982–83 and fiscal 1983–84. (*See* N.T. of November 3, 1982 at 30, 107–131 (testimony of DPW Secretary Helen O'Bannon). The Orders of the Court in this case are not contingent upon political conditions. Rather, this Court's Orders in this litigation are based solely on the rights of the retarded residents of Pennhurst to receive minimally adequate habilitation.

This Court is concerned with the vindication of these legal rights, not the methods by which the Commonwealth defendants intend to fund the community placements required by this Court's Orders. The Commonwealth defendants may place all Pennhurst class members in community facilities eligible for federal funding pursuant to the 2176 Waiver, the ICF/MR program, or any other program. Indeed, this Court has frequently urged the Commonwealth defendants to make greater efforts to make use of the available federal programs which would essentially halve the state's cost of providing the community habilitation mandated by this Court's Orders. If, however, the Commonwealth defendants choose to follow a course of funding which fails to take advantage of federal funds, the Court will not intervene so long as the Court's Orders, which require only that the defendants pro-

vide the plaintiffs with their legal rights, are fulfilled. However, this Court has always had difficulty understanding the Commonwealth defendants' reluctance to pursue available federal funding which in many instances would lessen the direct burden on Pennsylvania taxpayers. (*See* pp. 1159–1161, *infra*, describing in brief the 2176 Waiver, the ICF/MR program, and the relative economic benefits of community habilitation as compared to habilitation received in large state institutions).

The Court further notes that the Commonwealth defendants, in submitting to the Court their plan for 1982–83 and 1983–84 community placements, not only failed to consult with the County defendants but also failed to plan for any community placements of Pennhurst class members from Bucks, Chester, Delaware and Montgomery Counties during the next two years. Rather, all of their proposed community placements would involve class members from Philadelphia County or from counties outside the Southeastern Region of Pennsylvania. The view of the Commonwealth defendants that they need not plan for the placement of Bucks, Chester, Delaware and Montgomery county class members is in direct contradiction of this Court's Order of March 17, 1978 as amended April 24, 1980, which requires the Commonwealth defendants, in conjunction with the other defendants, to take all necessary steps to effectuate the community transfer of Pennhurst residents, especially all Pennhurst residents for whom community living facilities are professionally appropriate for providing minimally adequate habilitation in the least restrictive environment.

The Commonwealth defendants, by failing to even attempt to plan for the community placement of suburban county class members during the upcoming two fiscal years, appear to have totally disregarded this Court's injunctive orders in this case.

The evidence presented at the September hearing demonstrates that the Commonwealth defendants have consistently failed to take full advantage of federal aid programs which could drastically reduce the Commonwealth's cost of community placement of the mentally retarded. Furthermore, the Commonwealth defendants have not planned and are not today planning to make optimal use of these federal programs in order to effectuate the community habilitation of the mentally retarded. In addition, the Commonwealth defendants continue to appear reluctant to take advantage of the potential economies that can be realized when community habilitation supplants institutional confinement as the primary means by which a state provides for the education, training, and care of its retarded citizens.

Specifically, the Commonwealth defendants have been slow to begin to adopt two federal programs designed to pay more than one-half the costs (normally borne entirely by the state) in connection with the community habilitation of the mentally retarded. These are (1) the use of small interim care facilities for the mentally retarded (ICF/MRs); and (2) the use of community living arrangements eligible for 55 percent federal funding pursuant to the federal government's "2176 waiver" program (explained more fully at pp. 1160–1161, *infra*).

A small ICF/MR is a community facility in which 4 to 10 retarded persons live and receive habilitative services either at home or in a nearby day program, much as they would in a community living arrangement. A small ICF/MR closely resembles one of the many community living arrangements containing an average of three persons per unit that are already providing community habilitation for many of Pennsylvania's retarded citizens. The United States government administers, through Title XIX of the Social Security Act, 42 U.S.C. § 1396d, a program which makes available to states more than one-half of the funds required to operate an approved intermediate care facility for the mentally retarded (ICF/MR). Many other states are meeting these standards and obtaining ICF/MR funds on a much greater scale than Pennsylvania.

Despite the apparent advantages of the use of ICF/MR qualified facilities for the

community habilitation of Pennhurst residents, the Commonwealth defendants have been slow to adopt and implement this program. In 1981–82 for example, only 27 community living arrangements in the Southeast Region were converted to ICF/MR status during fiscal 1981–82. The Commonwealth defendants have planned to operate a larger number of ICF/MR facilities during fiscal 1982–83, largely to use these facilities to house class members that the defendants have been required to place pursuant to this Court's Order of March 2, 1981. However, funding disputes between the Commonwealth and providers of community facilities and habilitation have made it difficult to determine whether the Commonwealth defendants will in fact establish and operate these ICF/MRs. *See* Memorandum of December 22, 1982. It can clearly be said, however, that the Commonwealth defendants have failed to utilize the ICF/MR program to its fullest extent in furtherance of the implementation of this Court's Order of March 17, 1978 as amended April 24, 1980.

The Commonwealth defendants have also had available to them, since October, 1981, the opportunity to acquire 55 percent federal funding of new community living arrangements pursuant to the 2176 waiver provided for in the Omnibus Budget Reconciliation Act of 1981, Section 2176 of P.L. 97–35 (enacted August 13, 1981; effective date of section 2176, October, 1981) (hereinafter "2176 Waiver"). The 2176 Waiver is now a part of Title XIX of the Social Security Act, 42 U.S.C. § 1396a *et seq.* and is codified at 42 U.S.C. § 1915(c). During the course of the September hearing, witnesses also referred to the 2176 Waiver as the "medicaid waiver," the Title XIX waiver, and the "Home and Community-Based Services Waiver."

Under the 2176 Waiver, a state, once its plan for implementation of the waiver has been approved by the federal government, may establish new community-based living arrangements and have 55 percent of the cost of operating the facility funded by the federal government. Currently, the CLAs to which Pennhurst residents have been transferred are 100 percent state-funded.

As with the ICF/MR program, eligibility for the 2176 Waiver provides that the community facilities that will receive federal funding meet certain minimum qualifications that may raise the operating cost of the facility slightly. However, a state that participates in the 2176 Waiver program or the ICF/MR program will spend approximately half of what it would otherwise spend to operate community facilities for the mentally retarded when the facilities are not eligible for these federal programs. Like the ICF/MR program, the 2176 Waiver program offers to the Commonwealth defendants a great opportunity to provide minimally adequate habilitation of the state's retarded citizens in flexible community-based facilities and programs at less than half the cost that the state has heretofore paid to operate its community facilities.

The Commonwealth defendants delayed even the study of the feasibility of participation in the 2176 waiver program. Despite the obvious funding advantages of the 2176 Waiver, the Commonwealth defendants have limited their Waiver request to Pennhurst residents from Philadelphia and have not included the four suburban County defendants.

The Commonwealth defendants initially represented to the Court that this limited 2176 Waiver application would be filed on October 1, 1982. It was, however, not filed until November 5, 1982. The federal officials in the Department of Health and Human Services (HHS) have since returned the application to the Commonwealth defendants because of technical deficiencies in the first waiver application. It is thus currently unclear whether and when the Commonwealth defendants will be approved for participation in this federal funding program limited to Philadelphia County during fiscal 1983–84.

The Commonwealth defendants testified that they currently intend a 2176 Waiver for Philadelphia County only before seeking to receive 55 percent federal funding for

other community facilities. However, administrators of community facilities for the mentally retarded in other states that have made or are planning to make extensive use of the 2176 Waiver program have determined that there exist substantial administrative economies of scale in operating 2176 Waiver-eligible community living arrangements on a statewide basis rather than first experimenting with the program in a few counties. Put more simply, it appears that the paperwork and other administrative overhead required to implement the 2176 Waiver program in one large urban County (Philadelphia) might prove to be as onerous as would be required to establish the 2176 Waiver throughout the Southeast Region of Pennsylvania. See N.T. of Oct. 27, 1982 at 25. Jeffrey Sandler, Director of the Division of Developmental Disabilities for the state of Colorado, testified at the September Hearing, based on both his personal knowledge regarding Colorado and his expert professional knowledge that other states are planning to make extensive use of the 2176 Waiver program. Indeed, the plans for financing community habilitation of the retarded on a statewide basis suggest that the 2176 Waiver can be quickly instituted on a widespread basis to serve a state's mentally retarded citizens at a substantial saving of state dollars. This evidence affords little, if any, justification for the Commonwealth defendants' decision to exclude the four suburban County defendants in the 2176 Waiver program. Once again, the conduct of the Commonwealth defendants indicates that they have priorities which they have placed above the habilitation of the state's mentally retarded citizens who are subject to this Court's Orders.

While this Court has been critical of the Commonwealth defendants' administration of the state's programs for the retarded, particularly their failure to fully utilize federal funding, the Court has no intention of ordering the Commonwealth defendants to pursue any particular method of funding. This Court has not, in the past, told and does not intend in the future to tell the Commonwealth defendants how they must finance the transfer, placement and habilitation of Pennhurst residents; it has only required that they effectuate these placements. The manner of funding compliance with this Court's Orders must be determined by the Commonwealth defendants. This Court will, however, as it has in the past, order the Commonwealth defendants to comply with this Court's injunctive Orders so that the retarded residents of Pennhurst may receive habilitation in accordance with their legal rights.

■ The Commonwealth defendants' priorities concerning the use of available funds is not a sufficient basis for the Commonwealth defendants' failure to comply with this Court's Orders. The Commonwealth defendants' attitude toward funding, as demonstrated by the evidence in this record, especially the evidence presented at the September hearing and the Hearing of April 16 and 19, 1982, has always been based on their own determination that other DPW programs were of higher priority than this Court's Orders in this litigation. In late May, 1982, for example, the Department of Public Welfare found that there were available $1.6 million of "carryover funds" originally appropriated to the Department in the 1980–81 budget. The Commonwealth defendants spent $509,000 of these funds in Allegheny county for additional costs associated with community placements. $188,871 was spent in Dauphin county to finish a phase-down of the Harrisburg Hospital Mental Retardation Unit which, unlike Pennhurst, is not the subject of a Court Order. $140,000 was spent in Lancaster County for implementing non-Pennhurst community placements. See N.T. 44–47, Comm.Def.Ex. 2. As previously noted in this Court's Memorandum of June 11, 1982 (542 F.Supp. 619), the Commonwealth defendants have spent more than $2.9 million to effectuate the closing of Marcy Hospital by transferring its residents to community habilitation facilities, even though Marcy was not the subject of a federal court order. See 542 F.Supp. at 627.

During fiscal 1983–84, the Commonwealth defendants also plan to spend a substantial amount of the DPW budget to reduce the populations at the Polk and Selingsgrove mental retardation institutions.

Polk now has a population of 1,221. Selingsgrove's population is approximately 1,100. During 1983–84, the Commonwealth defendants desire to place enough persons in community facilities so that the populations of both Polk and Selingsgrove fall below 1,000. In other words, the Commonwealth defendants plan to place at least 321 persons from Polk and Selingsgrove in community facilities but refuse to support the modest plans of the County defendants to place 143 Pennhurst residents and other members of the plaintiff class in community facilities during the next 18 months.

At this juncture, it behooves all concerned to once again assess the situation. For five years now, this Court has only required that the Commonwealth defendants do what they themselves said at trial that they wished to do—provide for the community-based habilitation of the retarded residents of Pennhurst where such treatment was the least restrictive professionally appropriate habilitation for the individual. As the evidence presented at trial and at numerous post-trial hearings has made clear, community habilitation appears more cost-effective than institutionalization. In the long run, full compliance with this Court's Order of March 17, 1978, as amended April 24, 1980, could save the Commonwealth and its taxpayers substantial sums of money.

As persons are transferred to the community, the operation of Pennhurst can be streamlined so that the operation of the institution costs far less. Unfortunately, the Commonwealth defendants have not seized this opportunity to reduce costs. In 1977, when Pennhurst's population exceeded 1,200 persons, its staff complement was 1,400. In 1982, with a population of between 600 and 700 persons, there were still 1,400 staffers at Pennhurst and the Pennhurst budget was $46 million, more than three times the budget of other state institutions in Pennsylvania housing comparable numbers of retarded residents. The per diem cost of maintaining a retarded resident at Pennhurst was more than $180 per day in 1982, compared to an average per diem cost of $135 per day in community facilities (ranging between $85 per day and $160 per day in community facilities). Clearly, a shift in emphasis to community habilitation should be less costly to the Commonwealth, provided the Commonwealth defendants desire to effectuate this Court's Orders in the most economical manner. As DPW Deputy Secretary Howse has observed:

> On balance, the community program is less expensive than institutionalization and offers a higher quality of service. However, ... it takes time to realize cost savings in the deinstitutionalization program.

Howse, "Piecing Together Existing Financial Resources," *reprinted in* P. Roos, B. McCann and M. Addison, *Shaping the Future Community Based Residential Services and Facilities for Mentally Retarded People,* (1980) at 67, (*See* N.T., October 13, 1982 at 158–160).

The Commonwealth defendants can both comply with this Court's Orders, save the taxpayers substantial sums, and enable many of the state's retarded citizens to enjoy a better life in which they are encouraged to develop their capabilities rather than to occupy space in an institution. All that need occur for this to happen is a serious effort by the defendants to implement the Court's Orders while taking full advantage of the ICF/MR program, the 2176 Waiver, and the opportunity to streamline Pennhurst. The actions of the Commonwealth defendants have often suggested that they desire to frustrate the legal rights of the plaintiff class rather than to accord these rights to the state's retarded. The dilatory tactics of the Commonwealth defendants create more than a forensic conflict between some state officials and this federal court. They threaten the quality of life for hundreds of retarded individuals who have committed no wrong and whose legal rights are being violated by continued confinement at Pennhurst.

On the basis of the evidence presented at the September hearing and other evidence that has been presented since this case began in 1974, this Court finds that the defendants reasonably can provide community living arrangements together with all the services required by the retarded person's

Individual Habilitation Plan for at least 143 Pennhurst residents (not covered by the School-Age Order or the Order of March 2, 1981) from the Southeast Region of Pennsylvania—9 from Bucks County; 15 from Chester County; 30 from Delaware County; 26 from Montgomery County; and 63 from Philadelphia County during the period from January 14, 1983 to June 30, 1984. The Court further finds that the defendants reasonably can provide community living arrangements together with all the services required by the retarded person's Individual Habilitation Plan for at least 81 other class members not currently residing at Pennhurst from the Southeast Region of Pennsylvania—13 from Bucks County, 18 from Chester County, 12 from Delaware County—14 from Montgomery County, and 24 from Philadelphia County during the period from January 14, 1983 to June 30, 1984. The Court also finds that the Commonwealth defendants reasonably can provide community living facilities, together with all the services required by the retarded person's Individual Habilitation Plan for at least 50 Pennhurst residents (not covered by the School-Age Order or the Order of March 2, 1981) from counties outside the Southeast Region of Pennsylvania during the period from January 14, 1983 to June 30, 1984. An appropriate Order will be accordingly entered.

### ORDER

AND NOW, this 14th day of January, 1983, for the reasons set forth in this Court's Memorandum of January 14, 1983,

IT IS HEREBY ORDERED:

1. Defendants shall provide community living facilities, together with all the services required by the retarded person's Individual Habilitation Plan for at least 143 Pennhurst residents from the Southeast Region of Pennsylvania (not covered by the School-Age Order or the Court's Order of March 2, 1981)—9 from Bucks County; 15 from Chester County; 30 from Delaware County; 26 from Montgomery County; and 63 from Philadelphia County, and for at least 81 other members of the plaintiff class from the Southeast Region of Pennsylvania not now residing in Pennhurst—13 from Bucks County; 18 from Chester County; 12 from Delaware County; 14 from Montgomery County; and 24 from Philadelphia County—during the period from the date of this Order to June 30, 1984.

2. The Commonwealth defendants shall provide community living facilities, together with all the services required by the retarded person's Individual Habilitation Plan for at least 50 Pennhurst residents (not covered by the School-Age Order or the Order of March 2, 1981) from Counties outside the Southeast Region of Pennsylvania during the period from the date of this Order to June 30, 1984,

IT IS FURTHER ORDERED: Within 60 days of the date of this Order, the Commonwealth and County defendants shall each prepare and submit to this Court specific plans (including but not limited to timetables, identification of the retarded persons for whom community living facilities and services will be provided, and arrangements being made to obtain appropriate providers for residential, programatic and support services) for complying with this Order.